31 So.3d 733 (2010)
Todd ZOMMER, Appellant,
v.
STATE of Florida, Appellee.
No. SC08-494.
Supreme Court of Florida.
March 11, 2010.
*736 James S. Purdy, Public Defender, and Michael S. Becker, Assistant Public Defender, Daytona Beach, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Stephen D. Ake, Assistant Attorney General, Tampa, FL, for Appellee.
*737 PER CURIAM.
Todd Zommer appeals his conviction for first-degree murder and his sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Zommer's conviction and sentence.

FACTS AND PROCEDURAL HISTORY
On May 17, 2005, Todd Zommer was indicted on one count of first-degree murder for the premeditated killing of Lois Corrine Robinson, a 77-year-old woman. Zommer was also charged with attempted first-degree murder, robbery, aggravated battery with a deadly weapon, grand theft of a motor vehicle (three counts), grand theft (two counts), uttering a forgery, fleeing and eluding at high speed or with wanton disregard, resisting an officer without violence, possession of drug paraphernalia, and leaving the scene of an accident with property damage. Immediately prior to the commencement of trial, Zommer pled guilty to all counts except the murder charge with regard to Robinson.
With regard to the murder, on April 12, 2005, the body of Robinson was discovered in her Kissimmee home after an officer from the Osceola County Sheriff's Office (OCSO) conducted a wellness check at the request of a neighbor. Robinson's vehicle was missing, and the level of decomposition indicated that she had been dead for several days. The same day, Kissimmee police officers spotted Robinson's vehicle and, having been advised that the vehicle was sought in reference to a homicide, attempted to initiate a traffic stop. The driver of the vehicle accelerated with officers in pursuit until the vehicle crashed. After a brief foot chase of the occupant, Todd Zommer was arrested and taken into custody.
In the days following the murder, Zommer admitted to numerous people that he killed Robinson. The four admissions were to: (1) Joanne and James Vella, a mother and son with whom Zommer consumed drugs for a five-day period surrounding the time of the murder; (2) Matthew Druckenmiller, another acquaintance with whom Zommer consumed drugs; (3) a reporter for an Orlando television station; and (4) OCSO detectives. A large portion of Zommer's statement to OCSO was suppressed by the trial court because the detectives had failed to correct an inaccurate assumption by Zommer that if he invoked his right to counsel he would be required to wait eight months for counsel to be appointed.
The details of the murder were thoroughly developed through Zommer's statements, testimony from witnesses, and Zommer's trial testimony. From time to time, Zommer would live with a neighbor of Lois Corrine Robinson (the same neighbor who requested that OCSO conduct a wellness check for Robinson). On Saturday, April 9, 2005, the neighbor told Zommer during a telephone conversation that Robinson had agreed to loan Zommer twenty dollars for gas. Zommer walked to Robinson's house to obtain the money and, when she opened the door, Zommer believed that Robinson recognized him as the individual who had stolen a boat from a neighbor's yard. Zommer accepted the twenty dollars from Robinson, left the premises, but then later returned. During his interview with the television reporter, Zommer described the event:
ZOMMER: I killed the lady, Corrine, you know, because she wouldn't mind her business, for one. . . . In the life that I live, she should've minded her business. That's what she shoulda did.
. . . .

*738 . . . I didn't realize how old she was oryou know, that's not a factor and, you know, the fact that she was a female didn't matter. It's just the fact that she had saw me do something, and she should have minded her business and she didn't. You know, it's just like anything else in the world.
REPORTER: What did she see you do?
ZOMMER: She seen me robbing  stealing something.
. . . .
. . . [W]hen I went over there that day to meet her, I finally meet her, the recognition was there.
. . . .
REPORTER: So is that why you killed her?
ZOMMER: Basically, yeah, to shut her up. Tell her mind her business. You know, when I was beating her, that's what I was telling her, too. "Now, you wanna talk, you wanna yell? Yell now. You wanna tell on somebody? Tell now."
When Zommer returned to the Robinson home, she began showing Zommer items that she collected. As Robinson was exhibiting her items, Zommer picked up a wooden instrument referred to as a ukelin and struck her over the head. According to Zommer, "she bounced back a little bit. And was like, `Oh, my God. What was that?' And I said, `It was your ceiling.' And when she looked up, I hit her again." Zommer struck Robinson repeatedly with the ukelin until it shattered. Zommer then hit Robinson with a hurricane lamp. He next obtained the cord from a computer mouse and placed it around Robinson's neck as he attempted to strangle her. During the attack, Robinson scratched and resisted. The mouse cord ripped several times, and Zommer later told Matthew Druckenmiller that "it was hard to choke somebody when their fingers were in the way." When the cord ripped, Zommer stopped the attack for a urination break. After the bathroom break Zommer again attacked Robinson, stepping on her head in the process. Then:
I think I kicked her in the face. I don't think I punched her at all; I just think I kicked her. And then she was kind of like flopping around. I hate to say that, but she wasevery time I kicked her, she'd moved to one spot and I'd kick her and I'd get in the otherI think I kicked her twice.
Zommer then stopped the attack and walked into the kitchen for a cool drink from the refrigerator. While in the kitchen, Zommer noticed a block of knives on the counter. Zommer fully described (during the television interview) the attack when he stated:
I went in the kitchen, got a knife and came back and lifted her throat up, stood behind her. . . . I straddled her, and lifted her head back and just sliced it, chu, chu, chu, chu.
And then I dropped her head and she gurgled and I kicked her again. And I sat and I watched her and I made sure she wasn't breathing.
Zommer admitted to one of the Vellas that he first attempted to cut Robinson's throat with his left hand to make it appear that a left-handed person had committed the murder. When the left-hand attempt did not work, Zommer confirmed that he had to use his right hand. He cut so deep into her throat that he could hear the knife hitting the bones. Zommer informed the reporter that after the murder:
I went home, took everything off, put it in a bag, ate, went back over there, got her car and drove her car down the street, walked back home, went back over there and made it look like a robbery. *739 And within that time frame, I threw the shoes and stuff away.
When asked by the reporter if he was under the influence of drugs at the time of the murder, Zommer replied that he was "sober as f* *k."
Subsequent to his arrest (and his confession to OCSO detectives) Zommer led the police to a dumpster where a plastic bag was recovered which contained bloody sneakers, socks, and a towel. A DNA analyst for the Florida Department of Law Enforcement (FDLE) testified that the blood on the sneakers and socks matched the known DNA profile of Robinson. A swab from the inside of one of the socks revealed DNA that matched the known DNA profile of Zommer at all thirteen relevant locations on the DNA strand. The analyst testified that the likelihood of randomly selecting a DNA profile of a Caucasian male who matched the DNA sample taken from the sock was one in 25 quadrillion. Further, an FDLE footprint analyst testified that the sneakers recovered from the dumpster exhibited design characteristics similar to a footprint impression that appeared on the back of the shirt that Robinson was wearing at the time of her death.
An associate medical examiner concluded that the cause of death was a large incised wound to Robinson's neck with massive hemorrhaging. The examiner determined that there were at least two incised wounds to the neck. One of the wounds was deep enough that it extended to Robinson's backbone, and the examiner explained it would have required a significant amount of force to cut through the blood vessels and tissues of the neck to reach bone. The wound was consistent with someone pulling the victim's head back and making the incision with a sharp object, such as a blood-stained knife that was recovered from Robinson's kitchen. The examiner noted that there were defensive wounds on the victim's hands. Further, Robinson had contusions and abrasions on the front and back of her body as well as her head, and the examiner concluded that the number of injuries was consistent with someone struggling against an attacker for a period of several minutes. The examiner opined that the head injuries were inflicted before the fatal neck wound because circulation to the head would have continued to develop the contusions found. The examiner testified that all of Robinson's injuries (other than the neck wound) could not have been caused by a single blow and a fall. Moreover, these blows would not have rendered her immediately unconscious, but may have left her stunned and disoriented.
Todd Zommer testified in his own defense. Although he described the murder in great detail, his testimony during trial differed from his prior statements in three main respects. First, Zommer testified at trial that he smoked crack cocaine before returning to Robinson's house; therefore, he was high at the time of the murder. Second, Zommer asserted during trial that he did not kill Robinson because she had witnessed him stealing a boat. Instead, he asserted that the only reason he returned to Robinson's home was because he was high and wanted to talk to someone. On cross-examination, he stated that he falsely admitted to stealing the boat to protect one of his friends. He also claimed that he fabricated the boat-theft motive because the inmates at the jail wanted to "kick my ass" and he had to "come up with a reason that's plausible for inmates to accept the fact that I killed a 77-old-woman [sic]." When asked why he commenced and continued the attack on Robinson, Zommer professed that he did not know, and could not provide a reason for his actions. Zommer also testified that the night before the *740 murder, he had unsuccessfully attempted to contact a childhood acquaintance because he felt that his life was coming unraveled and he was experiencing homicidal thoughts. Third, Zommer contended during trial testimony that Robinson appeared to be unconscious after he struck her with the lamp, that she never fought him during the attack, and that she never used her hands in an attempt to block the mouse cord from strangling her.
During cross-examination, Zommer was impeached with the following statements:
I woke up that morning and I said, you know, what? I'm just gonnaI'm going all out. F* *k it. Can't stand her. I don't even know her, dude. The. . . hate, you know, it builds up. . . . I'm sorry that she's seventy-seven years old. It has nothing to do with it. It's not an age. . . . It could have been a nineteen-year-old.. . . I don't think it would have mattered at that straight time. And the sad thing about it, it felt so good. You know, what I'm saying?
. . . .
I knew right as soon as I saw [the ukelin], that's what I was going to use. . . . I said "Why don't you get up and walk me around your house." What I really was doing is checking out who could see through what. . . . I said, "Why don't you show me your dolls, dah, dah, dah." And I'm walking around, the whole time I've already planned it in just the right spot.
. . . .
She started rolling around and grabbing my leg and s* *t. And I'm like, "Get the f* *k off me, you snitching bitch." And this has motivated me to keep doing it.
. . . .
I went berserk, dude. But then I remember going in the kitchen looking for a knife. . . . And I always told myself, it would be f* *king so cool to f* *king slice the bitch's head off. . . .
So I went in the f* *king kitchen. I got me this long ass f* *king knife, and I stood over her like a f* *king cowboy riding her like this, and I was f* *king yanking her, yanking her. And not thinking of nothing but getting my s* *t. . . . It wasn't the fact she's a woman or older, anything like that. It was the fact the bitch seen me doing something I got caught doing.
The jury convicted Zommer of first-degree premeditated murder.
During the penalty phase, the medical examiner testified that, based on the testimony presented during the guilt phase and the results of the autopsy, it would have taken significant time to inflict the multiple injuries upon Robinson's body. The examiner concluded that being hit with the ukelin and the hurricane lamp, as well as being strangled with a mouse cord, would have caused Robinson pain. According to the examiner, Robinson's injuries were consistent with someone who had been struggling, and the fact that Robinson struggled to pull the mouse cord from around her neck indicates that she had been conscious at that point of the attack.
To establish the prior violent felony aggravator for the crimes of attempted first-degree murder, robbery, and aggravated battery with a deadly weapon, the State presented the testimony of Edgardo Fuentes. Fuentes testified that on April 12, 2005 (the same day Robinson's body was discovered), he was crossing a parking lot on his way to work when he heard an engine and, shortly thereafter, he was struck from behind by a car. Fuentes hit the windshield and flipped over the car. When he regained composure, he saw two men (one of whom was Zommer) walking toward him. When Fuentes reached out *741 his hand for help, the two men started kicking him. After stealing his wallet, the men left in the vehicle.
A deputy from OCSO testified that in April 2005, a man who had purchased a boat from Zommer called because he was concerned that it had been stolen. However, the deputy was unable to determine whether the boat was, in fact, stolen. Lastly, the State offered victim impact statements from Robinson's family.
The defense presented the testimony of multiple witnesses during the penalty phase. Zommer's younger half-brother testified that their mother, Denise, was an alcoholic. Zommer was protective of his mother even though she was not kind to him. The brother testified that on one occasion, when his (the brother's) father was choking Denise, Zommer intervened to defend her with force. Zommer's adopted sister testified that while Denise was a stern and unloving parent to her other children, her behavior toward Zommer was actually cruel. Denise subjected Zommer to very harsh punishments and also would blame him for things that he did not do.
During his childhood, Zommer was placed in three separate facilities by his mother due to his disruptive behavior. His first placement occurred due to the fact that Zommer was setting fires as a child. According to the sister, when Zommer was sent to the third and final facility, the Children's Center in Hamden, Connecticut at the age of eleven, his siblings knew where he was going but Zommer did not. Instead, Zommer's mother left him there with a backpack. The sister testified that Denise emancipated Zommer at age sixteen, and Zommer thereafter worked and purchased items for the family home. However, after Zommer moved out, Denise would pretend that she did not know him when she saw him on the street, even when it appeared that he was having personal or financial difficulties.
Danny Newell served as a child care worker at the Children's Center during Zommer's stay there, which extended almost five years. Newell testified that while at the Center, Zommer clung to the adults and liked to receive approval. He also was impulsive and engaged in attention-seeking behavior. Newell recalled long periods of time when Zommer was not allowed to return homeeven during the holidaysand testified that, although sometimes Zommer stayed at the center because of behavioral issues, other times it was because there was no one available for him at home. Newell also testified that while Zommer never attacked adults or other children, he had to be restrained at times. After Zommer left the center, he maintained contact with Newell. Newell testified that because Zommer had been on medication while at the center, he spoke to Zommer about the dangers of self-medicating with drugs or alcohol. Newell confirmed that on the day before the murder, Zommer left a message for him at the center informing Newell that he needed to speak with him. Newell stated that although Zommer sounded stressed in the message, he did not explain the nature of his problem in the message.
Daisy Mendoza, a substance abuse counselor at the Osceola County Jail who provided GED, parenting, and substance abuse classes to the prisoners, testified Zommer would participate in and benefit from as many classes as he could. She further testified that for the eleven months prior to her testimony, Zommer had served as a representative for the inmates in his jail pod. Mendoza opined that Zommer would function well in a controlled environment.
Clinical psychologist Jethro Toomer concluded that Zommer suffers from a *742 borderline personality disorder, which is characterized by mood instability and unpredictability, plus an underlying diagnosis of a substance abuse disorder. Zommer's developmental history (i.e., an alcoholic mother who neglected and failed to nurture him; an unpredictable environmental climate characterized by repeated institutionalization) was consistent with etiological factors that lead to development of borderline personality disorder. According to Toomer, the lack of a stable environment caused Zommer to grow up without acquiring the thought processes, skills, and emotional maturity to address everyday stressors. Toomer explained that individuals with borderline personality disorder frequently self-medicate because they are trying to compensate for their deficits in coping with daily stress and situations. Toomer offered an anxiety disorder as a secondary diagnosis. Toomer concluded that although Zommer claimed that he was not high at the time of the murder, Zommer is an unstable individual whose accounts of events cannot be trusted. Toomer explained that he did not reach a diagnosis of antisocial personality disorder in part because for a period of two and a half years, Zommer was married and worked without any indication of drug use or criminal activity. According to Toomer, individuals with antisocial personality disorder do not have episodes of appropriate functioning, conscience, or concern for the welfare of others.
Psychiatrist Jeffery Danziger concluded that Zommer suffers from a bipolar mental illness, which is characterized by episodes of mania and depression, and that Zommer was mentally ill at the time of the murder. Danziger provided a secondary diagnosis of substance abuse and explained that it is not unusual for people who suffer from bipolar disorder to use drugs, and more specifically, cocaine and methamphetamine. Use of these drugs by a bipolar individual can produce extreme aggression and irritability with a high risk of violence. Danziger concluded that since Zommer still had traces of the breakdown components of cocaine in his system thirteen days after his incarceration, he must have had a significant amount of the drug in his system at the time of the murder. According to Danziger, the mixture of drugs with his bipolar disorder placed Zommer in a condition in which he was actively mentally ill, but acting in a cruel and heartless manner during the murder. Danziger disagreed with the borderline personality diagnosis of Toomer and concluded that some of Zommer's reckless conduct, which included taking his young son to a crack house, was more consistent with antisocial personality disorder or someone who is in the manic stage of a bipolar disorder. Danziger noted that during a 2004 incarceration, a Florida Department of Corrections (DOC) psychiatrist had also diagnosed Zommer as suffering from antisocial personality disorder. Both Toomer and Danziger agreed that Zommer was not insane at the time of the offense and that he was able to distinguish right from wrong.
In rebuttal, the State presented the testimony of psychologist Daniel Tressler, who concluded that Zommer suffers from antisocial personality disorder with polysubstance dependence and attention deficit disorder as secondary diagnoses. Tressler noted that antisocial personality disorder is characterized by a longstanding pattern of disregard for others, lack of remorse, and a tendency to engage in reckless or illegal conduct. Tressler explained that Zommer became disruptive at age three when he began setting fires and his behaviorwhich included destruction of property and animal abuseeventually became so aggressive and disruptive that his mother sent him to facilities for troubled children. *743 Tressler explained that the fact that Zommer had relationships with his wife and Robinson's neighbor does not eliminate the possibility that he suffered from antisocial personality disorder. Rather, Zommer's actions toward these women were consistent with obtaining what he wanted from them as opposed to being engaged in a loving relationship. Tressler suspected that Zommer's abandonment by his mother produced a high degree of anger that festered for many years and was reenacted through his relationships with other women. Tressler did not agree with a diagnosis of borderline personality disorder because (1) individuals who suffer from borderline personality disorder are usually women; and (2) when faced with issues of rejection, individuals with borderline personality disorder usually engage in self-destructive behavior, whereas individuals who suffer from antisocial personality disorder tend to become angry and are more likely to harm others. Tressler explained that antisocial personality disorder is a character disorder and that people who suffer from it have control over their behavior. Accordingly, Tressler concluded that Zommer was not insane or under extreme emotional distress at the time of the murder, and he knew the consequences of his actions.
On December 19, 2007, the jury recommended a death sentence by a vote of ten to two. During the Spencer[1] hearing, neither Zommer nor the State offered additional evidence.
On February 22, 2008, the trial judge sentenced Zommer to death for the murder of Lois Corrine Robinson. The trial court determined that the State had proven beyond a reasonable doubt the existence of four statutory aggravators: (1) Zommer had previously been convicted of a felony involving the use or threat of violence to the person, see § 921.141(5)(b), Fla. Stat. (2005) (the three convictions for crimes against Edgardo Fuentes, which the trial court treated as one prior violent offense) (significant weight); (2) the murder was committed for the purpose of avoiding lawful arrest, see § 921.141(5)(e), Fla. Stat. (2005) (great weight); (3) the murder was especially heinous, atrocious, or cruel (HAC), see § 921.141(5)(h), Fla. Stat. (2005) (great weight); and (4) the murder was cold, calculated, and premeditated (CCP), see § 921.141(5)(i), Fla. Stat. (2005) (great weight).
Although Zommer alleged the existence of seventy separate mitigating circumstances, the trial court combined them into thirteen groups (two statutory and eleven nonstatutory). The trial court rejected both statutory mitigating circumstances asserted by Zommer. The trial court first concluded that Zommer was not under an extreme mental or emotional disturbance at the time of the crime, concluding that "the defendant has an antisocial personality disorder and a dependence on multiple substances, but the drug dependence did not cause or substantially contribute to [the] killing of Ms. Robinson." The trial court next concluded the statutory mitigating circumstance that the capacity of Zommer to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired had not been established. Instead, the trial court found that "[t]he facts of the case clearly establish that the defendant knew what he was doing was wrong and took steps to try to cover up his crime."
The trial court found a total of ten nonstatutory mitigating circumstances: (1) Zommer had a deprived childhood and a *744 dysfunctional family (moderate weight);[2] (2) Zommer has a history of drug abuse and dependence (little weight);[3] (3) Zommer has exhibited good conduct while incarcerated (little weight); (4) Zommer can be productive in prison (little weight); (5) society can be protected by the imposition of a life sentence (little weight); (6) Zommer accepted responsibility for his actions during trial (little weight); (7) Zommer suffers from mental health disorders that do not rise to the level of a major mental illness (little weight); (8) Zommer was generally protective of his mother and his younger brother (little weight); (9) Zommer was in special education classes and experienced difficulty in school as a child, but eventually obtained a GED (little weight); and (10) on the night before the murder, Zommer attempted to contact Danny Newell and talk to him about having homicidal thoughts (moderate weight). The trial court held that the following nonstatutory mitigating circumstances had not been established: (1) Zommer was a good husband and father and was able to have a positive family experience when he was not on drugs; (2) Zommer is not racially prejudiced; (3) Zommer played basketball when he was a child; and (4) Zommer experienced oxygen deprivation during birth.
In imposing a sentence of death, the trial court stated:
[T]he aggravating circumstances in this case far outweigh the mitigating circumstances.... [T]he truly heinous, atrocious and cruel manner in which this murder was committed standing alone, even in the absence of the other aggravating circumstances, is sufficient to far outweigh the mitigating circumstances in this case.
This direct appeal followed.

ANALYSIS

Sufficiency of the Evidence
As a preliminary matter, even if a defendant has not presented a sufficiency challenge, this Court has an independent obligation to review the record to determine whether sufficient evidence exists to support the conviction. See Overton v. State, 801 So.2d 877, 905 (Fla.2001); Fla. R.App. P. 9.142(a)(6). Here, Zommer has consistently admitted that he murdered Robinson. In support of premeditation, the record reflects that Zommer decided to kill Robinson when he perceived that she recognized him as the person who stole a boat from the neighbor's yard. Zommer described in painstaking detail how he selected his choice of weapon, evaluated the layout of Robinson's house to see if anyone outside could see inside, and then used multiple means to effectuate her death. We conclude there is sufficientindeed, abundantevidence to support the conviction for premeditated murder.

CCP Aggravating Circumstance
Zommer first challenges the finding of the cold, calculated, and premeditated (CCP) aggravating circumstance by the trial court. This Court has explained the standard of review for an aggravating factor as follows:
"[I]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable *745 doubtthat is the trial court's job. Rather, [this Court's] task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding." Willacy v. State, 696 So.2d 693, 695 (Fla.1997) (footnote omitted); see also Occhicone v. State, 570 So.2d 902, 905 (Fla.1990) ("When there is a legal basis to support finding an aggravating factor, we will not substitute our judgment for that of the trial court...."); Brown v. Wainwright, 392 So.2d 1327, 1331 (Fla.1981) ("Our sole concern on evidentiary matters is to determine whether there was sufficient competent evidence in the record from which the judge and jury could properly find the presence of appropriate aggravating or mitigating circumstances.").
Franklin v. State, 965 So.2d 79, 98 (Fla. 2007).
This Court has explained that to support the CCP aggravator, a jury must find that (1) the killing was the result of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage; (2) the defendant had a careful plan or prearranged design to commit murder before the fatal incident; (3) the defendant exhibited heightened premeditation; and (4) the defendant had no pretense of moral or legal justification. See Buzia v. State, 926 So.2d 1203, 1214 (Fla. 2006) (quoting Jackson v. State, 648 So.2d 85, 89 (Fla.1994)). To establish CCP, the evidence must prove beyond a reasonable doubt that the defendant planned or prearranged to commit murder before the crime began. See Thompson v. State, 565 So.2d 1311, 1318 (Fla.1990). The heightened premeditation required to satisfy this aggravator has been found where a defendant had the opportunity to leave the scene with the victim alive, but chose instead to commit the murder. See Alston v. State, 723 So.2d 148, 162 (Fla.1998). We have also explained that a chronic drug abuser can still act in accordance with a deliberate plan where the evidence indicates that he "was fully cognizant of his actions on the night of the murder." Guardado v. State, 965 So.2d 108, 117 (Fla. 2007) (quoting Robinson v. State, 761 So.2d 269, 278 (Fla.1999)).
We conclude that there is competent, substantial evidence to support the finding of this aggravating circumstance. Zommer admitted during his testimony that he was having homicidal thoughts on the night before the murder. When Zommer went to Robinson's house to borrow money and thought Robinson recognized him as the individual who stole the boat from the neighbor's yard, he did not fly into a rage and attack her. Instead, he left her residence and then later returned with the intent to kill her so that she would not report him as the thief. Although Zommer was a heavy drug user during the time surrounding the murder, his own statements indicate that he carefully formulated his plan to kill Robinson. When he reentered the house, he asked her to show him her collections purely as a pretense, when actually he was looking for a murder weapon and also to determine whether individuals outside could see what was occurring inside of the house.
Zommer made a conscious decision to attack Robinson with the ukelin. She was on her hands and knees, returning one of her dolls to its place in her collection, when Zommer first chose to strike her on the head. Once the instrument was destroyed during the beating, he proceeded to use various alternative items to effectuate her death. There were multiple breaks and intervals in the attack during which Zommer could have decided to leave Robinson *746 wounded but alive. In fact, Zommer completely stopped the attack twiceonce to urinate and once to retrieve a cold drink from Robinson's refrigerator. Instead of leaving, Zommer chose to continue the assault, procuring additional weapons until he finally succeeded in killing her. Zommer admitted to OCSO that when he saw the knife in the kitchen, he thought that it would be "so cool to ... slice [her] head off." Consistent with this statement, the cut to Robinson's throat was so deep that it nearly decapitated her.
The trial court's finding of CCP is consistent with other cases in which this Court has upheld the application of this aggravator. See, e.g., Guardado, 965 So.2d at 117 (CCP established where defendant planned to kill the victim and rob her to acquire drug money; defendant confessed that he chose the victim because of the secluded location of her house and the fact that she would open up her home to him due to their prior relationship); Buzia, 926 So.2d at 1214-15 (CCP established where defendant had multiple opportunities to leave the victims' residence without causing further harm, but instead chose to commit the murder, and where the defendant left the immediate vicinity of one victim during the attack to procure the weapon that was used to commit the murder); Barnhill v. State, 834 So.2d 836, 851 (Fla.2002) (CCP established where the defendant waited in the victim's house for an extended period of time, observing the victim and planning his course of action; defendant also "had the time and opportunity to reflect upon his action before the first strangulation was attempted, before the towel ligature was employed, and again before the belt was used"); Rose v. State, 472 So.2d 1155, 1159 (Fla.1985) (CCP established where defendant searched in an adjacent lot to find a concrete block to use as a murder weapon, walked back to where the victim was located, lifted the block over his head, asked the victim to stand up, and then hurled the concrete block onto the head of the victim multiple times).
Accordingly, we conclude that this aggravating circumstance was supported by competent, substantial evidence and affirm the finding of the trial court.

HAC Aggravating Circumstance
Zommer next contends that the trial court improperly found that the murder of Robinson was heinous, atrocious, and cruel (HAC). This Court has stated:
The HAC aggravating factor applies in physically and mentally torturous murders which can be exemplified by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another. HAC focuses on the means and manner in which the death is inflicted and the immediate circumstances surrounding the death, rather than the intent and motivation of a defendant, where a victim experiences the torturous anxiety and fear of impending death. Thus, if a victim is killed in a torturous manner, a defendant need not have the intent or desire to inflict torture, because the very torturous manner of the victim's death is evidence of a defendant's indifference.
Barnhill, 834 So.2d at 849-50 (citations omitted). In determining whether an aggravating factor has been proven, this Court had held that "the trial judge may apply a common-sense inference from the circumstances." Gilliam v. State, 582 So.2d 610, 612 (Fla.1991) (internal quotation marks omitted) (quoting Swafford v. State, 533 So.2d 270, 277 (Fla.1988)). Moreover, we have noted that the fact that the attack occurred within the supposed safety of the victim's own home "adds to the atrocity of the crime." Williams v. State, 967 So.2d 735, 763 (Fla.2007) (quoting *747 Perry v. State, 522 So.2d 817, 821 (Fla.1988)).
Zommer contends that competent, substantial evidence does not support this aggravating circumstance because Robinson was rendered unconscious almost immediately. See generally Buzia, 926 So.2d at 1212 ("[N]othing done to the victim after the victim is dead or unconscious can support this aggravator. Therefore, awareness of impending death is critical in determining whether a beating unnecessarily tortured the victim." (citations omitted)). This is the only remotely possible manner for Zommer to challenge this aggravator given the events as described by Zommer himselfhe beat Robinson with a ukelin, struck her with a hurricane lamp, "stepped" on her head, kicked her, attempted to strangle her, and finally cut her throat. The medical examiner testified that being struck with the ukelin and the hurricane lamp and being strangled with the mouse cord would have caused Robinson pain.
This Court has previously upheld the HAC aggravating factor in cases where a conscious victim was beaten or strangled prior to his or her death. See, e.g., Conde v. State, 860 So.2d 930, 955 (Fla.2003) ("Strangulation with great force applied around the victim's neck after a violent beating until unconsciousness takes over [is] heinous, atrocious, or cruel." (quoting trial court's order)); Randolph v. State, 562 So.2d 331, 338 (Fla.1990) (affirming HAC where defendant repeatedly hit, kicked, strangled, and knifed victim who was conscious during various stages of the attack); Perry, 522 So.2d at 821 (HAC aggravating factor established where victim was choked and repeatedly stabbed while she attempted to ward off a knife attack). Moreover, the lack of defensive wounds on the body of the victim has not precluded this Court from holding the HAC aggravator applicable. See, e.g., Francis v. State, 808 So.2d 110, 121, 134-35 (Fla.2001) (approving HAC aggravator where 66-year-old victim who was repeatedly stabbed had only one defensive wound); Guzman v. State, 721 So.2d 1155, 1160 (Fla.1998) (HAC aggravator upheld in stabbing/hacking murder where victim only suffered one defensive wound to his hand). Finally, Zommer's own statement that he taunted Robinson as he beat her reflects his utter indifference to her suffering.
We conclude that the trial court properly rejected Zommer's contention that Robinson was unconscious during most of the attack. First, Zommer in prior statements admitted that Robinson struggled. Zommer told OCSO detectives that during the attack Robinson was "rolling around and grabbing [his] leg." Zommer also informed acquaintance Matthew Druckenmiller that during the attack, Robinson was scratching and fighting with him and that she used her hands in an attempt to block the mouse cord from strangling her. Although these facts are derived from Zommer's own statements, and during trial Zommer contended that his earlier statements were fabrications, this Court has held that "[a] trial judge is not prevented from relying on specific statements made by the defendant if they have indicia of reliability, even if the defendant has given several conflicting statements." Barnhill, 834 So.2d at 850.
Evidence corroborates Zommer's earlier statements that Robinson was conscious through most of the attack. The medical examiner testified that Robinson suffered multiple contusions on the back, side, and front of her body, as well as her head, and that it would have taken several minutes for these wounds to have been inflicted. During trial, Zommer himself stated that "the time frame [of the murder] isn't as *748 short as people are ... making it seem." Further, the medical examiner stated that these injuries were consistent with a person who was "being hit, falling, getting up, being hit, falling, getting up and being hit." Moreover, the two defensive wounds on Robinson's hands were consistent with someone struggling with an attacker.
Additionally, the trial court made a finding when it denied Zommer's motion for judgment of acquittal on the HAC aggravating circumstance which supports the conclusion that Robinson was conscious throughout the attack. Zommer testified that his attempt to strangle Robinson had failed because when he tried to pull the cord around her neck, it slipped out of his hand. In support of this testimony by Zommer, defense counsel noted during argument on the motion that there was no evidence of petechial hemorrhaging with regard to Robinson's neck or eyes. However, in denying the motion, the trial court reached a different conclusion as to the lack of petechial hemorrhaging:
The very evidence that you speak of ... that the medical examiner found no evidence of petechia ... that suggests a strangulation indicates to the court that she was in fact awake and aware and fighting the strangulation, so she was aware of her impending death as he was attempting to strangle her with the cord. In fact, her efforts in fighting this off are what kept her from being strangled with the cord, which also suggests to the court that she likely was conscious when her throat was slashed, because the last thing that was done to her before slashing the throat was the attempted strangulation, which was not successful in killing her.
The trial court's finding is supported by the evidence in that a crime scene technician testified that she collected pieces of a mouse cord that were found near Robinson's body and throughout the house. Zommer advised Druckenmiller that the cord "ripped several times," and Druckenmiller testified that "[i]t was my understanding that [when the cord ripped is] when her fingers got in the way." The presence of a broken cord is more consistent with a failed strangulation than it is with the cord merely slipping out of Zommer's hands.
In light of the foregoing, we agree with the trial court that Robinson was conscious through most of the attack and may even have been conscious when her throat was cut. Given the brutality of the prolonged attack on this 77-year old woman in her home, she unquestionably experienced fear, pain, and anxiety of impending death. We therefore hold that competent, substantial evidence supports the HAC aggravating circumstance.

Statutory Mitigation
Zommer next asserts that the trial court failed to properly interpret the statutory mitigating evidence offered and failed to correctly apply the law with regard to such mitigation. We disagree. A trial court may reject a mitigating circumstance provided that the record contains competent, substantial evidence to support the rejection. See Reynolds v. State, 934 So.2d 1128, 1159 (Fla.2006).
As previously discussed, the trial court rejected both statutory mitigating circumstances asserted by Zommer. With regard to the "extreme mental or emotional disturbance" statutory mitigating circumstance, the record reflects that the three experts did not agree upon a mental health diagnosis. While all three doctors agreed that Zommer suffered from a substance abuse disorder, Dr. Toomer was the only doctor who concluded that Zommer suffers from borderline personality disorder (as opposed to antisocial personality disorder). Toomer nonetheless agreed *749 that Zommer possesses all seven criteria of antisocial personality disorder and was diagnosed with conduct disorder as a child (a prerequisite to a diagnosis of antisocial personality disorder). Conversely, both Dr. Danziger and Dr. Tressler concluded that Zommer suffers from antisocial personality disorder. Dr. Danziger also concluded that Zommer suffers from bipolar disorder, a diagnosis with which Dr. Tressler disagreed because after the drugs were removed from Zommer's system, there was no evidence of the disorder. Dr. Tressler disagreed with a diagnosis of borderline personality disorder because individuals who suffer from this disorder are usually women and are more likely to harm themselves than others when faced with rejection. Dr. Tressler explained that people who are diagnosed with antisocial personality disorder have control over their behavior and their actions are not driven by a mental illness that causes them to misperceive reality. Tressler opined that Zommer's ability to describe the murder in great detail and with great focus indicated that at the time of the murder he was not in a state where he misperceived reality.
This Court has explained that "[j]udgments of credibility are within the trial court's purview." Jones v. State, 966 So.2d 319, 330 (Fla.2007). A trial court has the discretion to reject a statutory mitigator where one expert's testimony is rebutted by that of another. See Walker v. State, 707 So.2d 300, 318 (Fla.1997). Here, the trial court weighed the testimony of each of these experts and chose to accept the diagnosis of antisocial personality disorder offered by Dr. Danziger and Dr. Tressler. In support of this finding, the trial court noted that Zommer was previously diagnosed as suffering from this disorder by a DOC psychiatrist during one of Zommer's prior incarcerations. Moreover, the record reflects that Zommer satisfies all seven criteria for antisocial personality disorder, and he could recall the events at the time of the murder with great precision. Based upon this evidence, we conclude that the trial court did not err when it accepted Dr. Tressler's diagnosis and rejected that of Dr. Toomer (with regard to borderline personality disorder) and Dr. Danziger (with regard to bipolar disorder). See generally Rose v. State, 787 So.2d 786, 802-03 (Fla.2001) (trial court's rejection of "extreme disturbance" mitigator not an abuse of discretion where even though one expert testified that defendant suffered from borderline personality disorder, the State rebutted this testimony with evidence suggesting that the defendant was a sociopath); Walls v. State, 641 So.2d 381, 390-91 (Fla.1994) (noting that opinion testimony "gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking"). Thus, competent, substantial evidence exists in the record to support the trial court's rejection of the "extreme emotional or mental disturbance" mitigator.
With regard to the statutory mitigating circumstance that Zommer's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired, all three experts testified that at the time of the murder, Zommer was capable of distinguishing right from wrong. Further, various actions by Zommer indicate that he was aware of the criminality of his conduct. When he first reentered Robinson's home and asked her to show him her collections, he stated that he was actually checking to see "who could see through what." Further, both during and after the murder, he engaged in various actions to cover up the crime, including: (1) first attempting to cut Robinson's *750 throat with his left hand so that it would appear that a left-handed person had committed the murder; (2) disposing of blood-stained items in a dumpster; (3) ransacking Robinson's home to make it appear as if a robbery had occurred; (4) driving Robinson's car away from her home so that individuals would believe she was not home; and (5) attempting to flee from police, both by car and on foot. This Court has previously upheld rejection of this statutory mitigating factor where a defendant "took logical steps to conceal his actions from others." Nelson v. State, 850 So.2d 514, 531 (Fla.2003) (quoting trial court's order) (after defendant received assistance in extricating his car from sand, the defendant deliberately drove to another location before murdering the victim); see also Pittman v. State, 646 So.2d 167, 170 n. 2 (Fla.1994) (defendant poured gasoline around house and yard and set fire to destroy evidence); Provenzano v. State, 497 So.2d 1177, 1184 (Fla.1986) (before the murder, the defendant hid the murder weapons and added change to a parking meter so that he would not receive a parking ticket).
Although Zommer testified he was high at the time of the murder, we conclude that the trial court properly rejected this assertion. Zommer himself admitted on national television that he was sober during the killing.[4] Moreover, the efforts at concealment listed above are not indicative of someone whose sense of criminality is impaired by drug use. Rather, these actions are indicative of someone who knows he has committed a serious crime and is taking steps to avoid detection. Therefore, although Zommer may have had some drugs in his system at the time of the murder,[5] the evidence does not support a finding that those drugs substantially impaired his capacity to conform his conduct to the requirements of the law or appreciate the criminality of his conduct. Competent, substantial evidence supports the trial court's rejection of this mitigating factor.
In light of the foregoing, we affirm the trial court's rejection of these two statutory mitigating circumstances.

Proportionality
In reviewing for proportionality, the totality of the circumstances should be considered and the matter should be compared with other capital cases. See Nelson v. State, 748 So.2d 237, 246 (Fla. 1999). This comparison, however, is not between the number of aggravating and mitigating circumstances. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). Additionally, the death penalty is reserved only for the most aggravated and least mitigated murders. See Kramer v. State, 619 So.2d 274, 278 (Fla.1993).
In the instant matter, the jury recommended the death penalty for the murder by a vote of ten to two. The trial court found this recommendation appropriate after weighing the statutory aggravating circumstances against the nonstatutory mitigating circumstances. In imposing the death sentence, the trial court found four statutory aggravators to be established beyond a reasonable doubt: (1) *751 Zommer had previously been convicted of a felony involving the use or threat of violence to the person (significant weight) (2) the murder was committed to avoid arrest (great weight); (3) the murder was heinous, atrocious, and cruel (great weight); and (4) the murder was cold, calculated, and premeditated (great weight). The trial court rejected both statutory mitigating circumstances alleged by Zommer, but found ten nonstatutory mitigating circumstances, only two of which were afforded "moderate" weight. None of the mitigating factors found by the trial court received "great," or even "significant," weight.
After reviewing the totality of the circumstances, and decisions from this Court, we conclude that the death sentence is proportionate. In Wike v. State, 813 So.2d 12 (Fla.2002), this Court upheld the death penalty where the trial court found the same four aggravators present here, one statutory mitigating circumstance, which was given little or no weight, and eight nonstatutory mitigating circumstances, two of which were accorded "some" weight. See id. at 16. Further, this Court has upheld the death penalty in cases where the prior violent felony, HAC, CCP, and avoid arrest aggravators were present, even though the trial court also found multiple mitigating factors. See, e.g., Buzia, 926 So.2d at 1207-08 (upholding death sentence where trial court found, in addition to other aggravators, prior violent felony, CCP, HAC, and witness elimination, and seven nonstatutory mitigators, two of which received "substantial" weight); Lott v. State, 931 So.2d 807, 811-12 (Fla.2006) (upholding death sentence where aggravating factors found by the trial court trial court included prior violent felony, CCP, HAC, and witness elimination and the trial court found six mitigating circumstances, according three of them "considerable" weight). This Court has also upheld the death penalty for murders in which fewer aggravating circumstances and more mitigating circumstances were found than in this case. See Duest v. State, 12 So.3d 734, 738 n. 3 (Fla.2009) (death sentence upheld where trial court found prior violent felony, HAC, and pecuniary gain in aggravation and twelve nonstatutory mitigating circumstances, two of which received great weight). Moreover, CCP, HAC, and prior violent felony are three of the weightiest aggravating factors in Florida's statutory sentencing scheme, see Morton v. State, 995 So.2d 233, 243 (Fla.2008); Sireci v. Moore, 825 So.2d 882, 887 (Fla. 2002), and the trial court found all three to apply to the murder of Robinson.
Zommer returned to the home of a 77-year-old woman with the intent to kill her because he believed that she recognized him as the person who stole a boat from her neighbor's yard.[6] Zommer asked Robinson to show him her doll collection to afford him time to (1) locate a murder weapon and (2) make sure that no one outside of the home could see inside. When Zommer commenced his attack, he brutally beat Robinson with multiple objects, kicked her, and stepped on her head, all while taunting and shouting at her. He attempted to strangle her with a mouse cord while she fought for her life. When the mouse cord broke, he finished the murder by grabbing her hair, pulling her head up, and cutting her throat from behind. Within days of the murder, Zommer used a vehicle to hit a complete stranger who was doing nothing more than walking to work. As he was on the ground, Zommer proceeded to kick the injured man and steal his wallet.
*752 We hold the death sentence is proportionate because the significant aggravators established in connection with the disturbing and brutal murder of Robinson far outweigh the mitigating factors found by the trial court.

Florida's Capital Sentencing Scheme
In his final issue, Zommer raises constitutional challenges to aspects of Florida's death penalty law. In brief, Zommer asserts that (1) a twelve-person jury must unanimously determine beyond a reasonable doubt the existence of facts that render a defendant eligible for the death penalty; (2) Zommer's indictment unconstitutionally failed to contain allegations that "sufficient aggravating circumstances exist" to justify imposition of the death penalty and "insufficient mitigating circumstances exist to outweigh the aggravating circumstances"; and (3) under section 921.141, Florida Statutes (2005), sufficient aggravating circumstances must be found to exist before a defendant is death-eligible, and by requiring only "one or more" aggravating circumstances to support a death sentence, the Florida courts are interpreting an unambiguous statute in violation of the separation of powers proscription contained in the Florida Constitution.
As a preliminary matter, even though Zommer in his initial brief asserted that this challenge has never been raised before, in his reply brief and during argument, counsel for Zommer stated that this Court has previously rejected this claim. Thus, Zommer has made inconsistent assertions. Further, while the State does not raise a preservation challenge, it appears that the precise issue presented here with regard to the indictment and the term "sufficient aggravating circumstances" was not raised by Zommer before the trial court. Instead, Zommer raised the traditional challenge that the indictment was unconstitutional because it failed to list the specific aggravators that the State sought to prove. Zommer specifically asked the trial court to order the State to identify "all statutory aggravating factors ... upon which the State is seeking imposition of capital punishment in this case," a request that was granted by the trial court. In that same motion, Zommer made the following assertion:
In Florida, a defendant convicted of first-degree murder cannot receive the death penalty in the absence of "sufficient" aggravating circumstances. As squarely held by the Florida Supreme Court, this necessarily requires the existence of at least one statutory aggravating circumstance.
(Emphasis supplied; citation omitted.) Thus, Zommer himself in his pretrial motions conceded that only one aggravator need be found to qualify a defendant for the death penalty. Given the absence from the record of any motion or argument that presented the claims raised here to the trial court, we conclude that this issue has not been preserved for review. Nevertheless, even if these claims had been preserved, they are without merit.
Zommer first asserts that Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), requires a unanimous twelve-person jury to make the findings of fact necessary to determine eligibility for the death penalty. He specifically asserts that Florida's capital sentencing statute requires the jury to unanimously find that "sufficient aggravating circumstances" exist and that "insufficient mitigating circumstances exist to outweigh the aggravating circumstances." However, on numerous occasions, we have rejected the assertion that Apprendi and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), require that aggravating and mitigating circumstances *753 be found individually by a unanimous jury. See, e.g., Frances v. State, 970 So.2d 806, 822 (Fla.2007); Hernandez-Alberto v. State, 889 So.2d 721, 733 (Fla.2004). Moreover, Zommer chose to waive a jury determination and enter guilty pleas for the attempted murder, aggravated battery, and robbery of Edgardo Fuentes. This Court has repeatedly held that the prior violent felony aggravating circumstance is a factor which, pursuant to Apprendi and Ring, does not need to be found by a jury. See, e.g., Frances, 970 So.2d at 822 (citing Apprendi, 530 U.S. at 490, 120 S.Ct. 2348); Jones v. State, 855 So.2d 611, 619 (Fla. 2003).
Zommer next contends that under Apprendi and sections 775.082[7] and 921.141(3),[8] Florida Statutes (2005), sufficient aggravating circumstances and insufficient mitigating circumstances must be charged in the indictment. However, we have previously rejected constitutional challenges to an indictment for failure to list the aggravating circumstances that the State intends to prove. See, e.g., Grim v. State, 971 So.2d 85, 103 (Fla.2007); Winkles v. State, 894 So.2d 842, 846 (Fla.2005); Lynch v. State, 841 So.2d 362, 378 (Fla. 2003). We articulated the basis for this holding in Vining v. State, 637 So.2d 921, 927 (Fla.1994):
The aggravating factors to be considered in determining the propriety of a death sentence are limited to those set out in section 921.141(5), Florida Statutes (1987). Therefore, there is no reason to require the State to notify defendants of the aggravating factors that it intends to prove.
See also Kormondy v. State, 845 So.2d 41, 54 (Fla.2003) ("While Ring makes Apprendi applicable to death penalty cases, Ring does not require ... notice of the aggravating factors that the State will present at sentencing...."). Like the available aggravating circumstances, the weighing process that must be performed by the factfinder when considering whether to impose a death sentence is also articulated in the Florida Statutes. See § 921.141(2)-(3), Fla. Stat. (2005). If the specific aggravators sought need not be charged in the indictment to satisfy due process, see Vining, 637 So.2d at 927, the weighing process that occurs under section 921.141 similarly does not need to be provided in the indictment for it to pass constitutional muster.
Lastly, Zommer contends that this Court is violating the constitutional *754 doctrine of separation of powers by holding that only one aggravating circumstance is "sufficient" to justify imposition of the death penalty since the statute contains the plural word "circumstances." However, in State v. Dixon, 283 So.2d 1 (Fla. 1973), this Court interpreted the term "sufficient aggravating circumstances" in Florida's capital sentencing scheme to mean one or more such circumstances. See id. at 9 ("When one or more of the aggravating circumstances is found, death is presumed to be the proper sentence unless it or they are overridden by ... mitigating circumstances....").
This Court has explained that "[t]he Legislature is presumed to know the judicial constructions of a law when amending that law, and the Legislature is presumed to have adopted prior judicial constructions of a law unless a contrary intention is expressed." Fla. Dep't of Children & Families v. F.L., 880 So.2d 602, 609 (Fla.2004) (emphasis supplied). Since the Legislature in the last thirty-six years has not amended the Florida Statutes to provide that at least two aggravating circumstances must be found to impose a sentence of death, it can be presumed that the Legislature agrees with and has adopted this Court's interpretation of the term "sufficient aggravating circumstances" that was articulated in Dixon. Accordingly, Zommer's separation of powers challenge lacks merit.
Thus, Zommer has not established any basis on which this Court should reconsider well-established points of law with regard to Florida's capital sentencing scheme. Accordingly, we deny relief on this issue.

CONCLUSION
Based upon the foregoing analysis, we affirm Zommer's conviction and sentence.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., specially concurs with an opinion.
PARIENTE, J., specially concurring.
I concur in the affirmance of the conviction and death sentence. I write only to address my concern with a portion of the majority's analysis of CCP and its extended discussion of the constitutionality of the death penalty statute. First, with regard to CCP, I agree that there was heightened premeditation necessary to support CCP. The main fact that establishes CCP is that, after Zommer borrowed money from Robinson and left her house, there was a substantial period of time before he returned to her house. The only purpose of returning to the house was to kill Robinson because he thought that she recognized him as the individual who stole the boat from the neighbor's yard. Further, Zommer's actions after coming into the house are consistent with a fully formulated and preplanned intent to kill her.
However, I write to emphasize that a prolonged attack where a defendant uses different items to kill the victim would not, by itself, be sufficient evidence to support a finding of CCP. There must also be other evidence of CCP, including evidence that the defendant had a prearranged design to murder the victim. The majority cites to Barnhill v. State, 834 So.2d 836 (Fla.2002), in which this Court upheld CCP where the defendant waited in the victim's house for an extended period of time and the defendant "had the time and opportunity to reflect upon his actions before the first strangulation was attempted, before the towel ligature was employed, and again before the belt was used." Id. at 851. *755 Although this Court considered the prolonged attack in Barnhill, it is important to note that the defendant in that case also "entered the victim's house, concealed himself,... observed the victim while plotting his course of action," told his accomplice what he was planning to do "with enough advance warning that [the accomplice] was able to leave the home," and spent approximately two hours in the victim's house before the killing the victim. Id. All of these facts demonstrated a prearranged design to kill the victim in that case and constituted competent, substantial evidence of CCP.
The majority also cites to Alston v. State, 723 So.2d 148, 162 (Fla.1998), in which this Court held that the heightened premeditation required to satisfy CCP was found where a defendant had the opportunity to leave the scene with the victim alive, but chose instead to commit the murder. However, Alston is distinguishable from the instant case and does not lend support to a conclusion that a prolonged attack in and of itself is sufficient to support the heightened premeditation required to satisfy CCP. There, the heightened premeditation was not found in a prolonged attack but in the fact that after the robbery, the defendant had ample opportunity to release the victim. See id.
Cases where there is a prolonged attack of a conscious victim resulting in the eventual murder generally support a finding of HAC but not necessarily CCP. We must exercise care not to expand aggravators so that they run afoul of the Eighth Amendment. As recently reiterated by the U.S. Supreme Court, "States must give narrow and precise definition to the aggravating factors that can result in a capital sentence.... Th[is] rule[ ] vindicate[s] the underlying principle that the death penalty is reserved for a narrow category of crimes and offenders." Roper v. Simmons, 543 U.S. 551, 568-69, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ("Because the death penalty is the most severe punishment, the Eighth Amendment applies to it with special force. Capital punishment must be limited to those offenders who commit `a narrow category of the most serious crimes' and whose extreme culpability makes them `the most deserving of execution.'" (citations omitted)); see also Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (holding that in order for an aggravating circumstance to not be constitutionally infirm, it "may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder").
A prolonged attack using different instruments available in the house where there is no other evidence supporting CCP, such as the defendant entering the house with the weapon in advance, could be just as much an indication of a lack of careful planning, which is inconsistent with CCP. However, here, as I have stated above, competent, substantial evidence supports CCP based on the facts that the murder was planned after Zommer left the victim's house the first time and that his only reason for returning was to murder her.
My other concern is the majority's extensive discussion of the constitutional challenges to Florida's death penalty scheme. I have on prior occasions explained why I am of the view that Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requires that aggravating circumstances, other than the fact of a prior conviction, be found by a unanimous jury beyond a reasonable doubt.[9] In this *756 case I agree, however, that the nonunanimous verdict is not constitutionally infirm because of the existence of the prior violent felony aggravator, which does not require a jury finding. See, e.g., Frances v. State, 970 So.2d 806, 822 (Fla.2007) ("Ring did not alter the express exemption in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that prior convictions are exempt from the Sixth Amendment requirements announced in the cases.").
As to the majority's citation to State v. Dixon, 283 So.2d 1, 9 (Fla.1973), that when one or more aggravating circumstances is found, death is "presumed" to be the proper sentence "unless ... overridden by ... mitigating circumstances," recent case law has explained that a defendant need not prove any mitigating circumstances to obtain a life sentence and that a jury is not compelled to recommend death when the aggravating factors outweigh the mitigating factors.[10] In recognition of these statements of law, our recently adopted jury instructions explicitly state exactly this proposition.[11]
However, I concur in the majority's affirmance of the conviction and sentence of death because competent, substantial evidence supports CCP and because Zommer's Ring claims fail as there is a prior violent felony aggravator in this case.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] The trial court qualified this finding as follows: "[T]here is no showing that these experiences diminished the defendant's ability to know right from wrong or recognize the seriousness and grave consequences of his acts."
[3] The trial court specifically found that Zommer was not impaired or intoxicated by drugs when the murder was committed.
[4] Although Robinson's neighbor found a crack pipe when she returned home from work on the day of the murder, the evidence did not establish whether Zommer smoked crack cocaine immediately after the murder or immediately before. Zommer testified that he used the twenty dollars that he borrowed from Robinson to buy crack cocaine.
[5] The trial court did find as a nonstatutory mitigating factor that Zommer "was dependent on the use of illegal drugs, primarily cocaine and methamphetamines" and accorded this factor little weight.
[6] The neighbor testified during trial that Robinson had previously stated she was unable to see the boat thieves well enough to recognize them.
[7] Section 775.082(1) provides:

(1) A person who has been convicted of a capital felony shall be punished by death if the proceeding held to determine sentence according to the procedure set forth in s. 921.141 results in findings by the court that such person shall be punished by death, otherwise such person shall be punished by life imprisonment and shall be ineligible for parole.
[8] Section 921.141(3) provides:

(3) Findings in support of sentence of death.Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death, but if the court imposes a sentence of death, it shall set forth in writing its findings upon which the sentence of death is based as to the facts:
(a) That sufficient aggravating circumstances exist as enumerated in subsection (5), and
(b) That there are insufficient mitigating circumstances to outweigh the aggravating circumstances.
In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact based upon the circumstances in subsections (5) and (6) and upon the records of the trial and the sentencing proceedings. If the court does not make the findings requiring the death sentence within 30 days after the rendition of the judgment and sentence, the court shall impose sentence of life imprisonment in accordance with s.775.082.
[9] See, e.g., Bottoson v. Moore, 833 So.2d 693, 719-23, 725 (Fla.2002) (Pariente, J., concurring in result only) ("[T]he maximum penalty of death can be imposed only with the additional factual finding that aggravating factors outweigh mitigating factors.... Florida juries in capital cases do not do what Ring mandatesthat is, make specific findings of fact regarding the aggravators necessary for imposition of the death penalty.... Florida juries advise the judge on the sentence and the judge finds the specific aggravators that support the sentence imposed.").
[10] See State v. Steele, 921 So.2d 538, 543 (Fla.2005) ("[T]o obtain a life sentence the defendant need not prove any mitigating circumstances at all."); Cox v. State, 819 So.2d 705, 717 (Fla.2002) ("[W]e have declared many times that `a jury is neither compelled nor required to recommend death where aggravating factors outweigh mitigating factors.' " (quoting Henyard v. State, 689 So.2d 239, 249-50 (Fla.1996))).
[11] See Fla. Std. Jury Instr. (Crim.) 7.11 (Penalty ProceedingsCapital Cases); see also In re Standard Jury Instructions in Criminal CasesReport No. 2005-2, 22 So.3d 17, 22 (Fla.2009) (adopting the "amendment stating that the jury is `neither compelled nor required to recommend death'").