PER CURIAM.
Stephen Smith appeals an order of the circuit court denying his motion to vacate his sentence of death filed under Florida Rule of Criminal Procedure 3.851. Smith also petitions this Court for a writ of habe-as corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons expressed below, we affirm the post-conviction court’s order and deny Smith’s petition.
I. BACKGROUND
In 2006, Smith was convicted of the first-degree murder of state correctional officer Darla K. Lathrem. On direct appeal, this Court set out the facts of the crime.
During 2003, [Smith and his codefen-dants, Dwight Eaglin and Michael Jones,] worked with a small group of other [Charlotte Correctional Institution (CCI) ] prisoners on renovations to the inmate dormitories. This construction work included plumbing and welding and thus provided inmate work crews with access to a number of tools. Beginning in early 2003, Smith, who was serving multiple life sentences, and Jones began to formulate an escape plan. They planned to build a ladder and escape over the perimeter fence. When their first plan was thwarted, however, Smith and Jones developed a new plan with Eaglin.
Under the new plan, the inmates would join ladders from the tool room at CCI by drilling holes and adding bracing. The amalgamated ladder would rise sixteen feet above the ground and span across the tops of both perimeter fences, which were at least twenty feet apart. With the ladder-bridge in place, Eaglin would go over the first perimeter fence and, when the guard truck drove by, attack the driver with a hammer. Because they needed access to ladders and other necessary tools, the trio planned to escape during the ongoing dormitory renovation project.
Smith and the others decided to escape before construction was completed on the final dormitory. To further facilitate the plan, Smith volunteered for the inmate crew that sometimes worked at night, which already included Jones and Eaglin. At such times, five or six prisoners worked in the empty dormitory under the supervision of a single corrections officer. In talking to other inmates about the plan, Smith said that he would kill any correctional officer guarding them and that he would be famous on the news. Smith preferred to escape when a female officer was on duty so that he could rape her — just in case he was killed during the escape.
*1041 On June 11, 2003, with renovations soon to be completed, the defendants put their plan into action. At 4:00 p.m., Officer Lathr[e]m took five inmates— the three defendants and two other inmates — to work in the dormitory for the evening. At 8:30 p.m., Lathr[e]m accounted for the five inmates, and about twenty minutes later, another officer personally picked up the count slip from Officer Lathr[e]m.
After the head count, Eaglin beat up one inmate[, John Beaston,] and locked him in a cell; Eaglin then returned with a sledgehammer and beat him to death. Smith and Jones told Officer Lathrem they needed something from a locked mop closet. They all went to the closet, where the officer began to search for the correct key. Eaglin struck her twice in the head with the sledgehammer. They took the officer’s radio and keys. While Eaglin struggled to put the officer’s body into the closet and lock the door, Smith and Jones left to assemble the ladders for the escape. Before joining Smith and Jones, Eaglin found the other inmate and hit him in the head with another hammer. Injuring the inmate was part of the plan because that inmate did not want to escape and did not want to be disciplined for cooperating with the escape plan. The defendants carried two large ladder sections outside and put them together. When they attempted to lift the ladder, however, it collapsed and fell against the perimeter fence, setting off an alarm.
Correctional officers responding to the alarm saw the three defendants attempting to escape. Eaglin stood between the perimeter fences; Smith was climbing a ladder leaning against the inner fence, with Jones standing nearby. Upon seeing the guards, Smith and Jones ran into the dormitory, where they were quickly apprehended. The correctional officers also discovered a pool of blood outside a locked mop closet. Officer Lathrem lay dead in the closet, a sledgehammer on the floor beside her. The responding officers also found the two other inmates, one with a head injury in one cell and the other dead in another cell.
Smith v. State, 998 So.2d 516, 520-21 (Fla.2008).
During the penalty phase, the State presented evidence about Smith’s 1990 convictions for murder, armed robbery, and armed burglary with assault; evidence about his other 1990 convictions for armed sexual battery, armed burglary, armed robbery, and kidnapping; evidence about a 1981 conviction for armed sexual assault of his sister; evidence from a medical examiner that Officer Lathrem was likely unconscious during the attack; and three victim impact statements. Smith presented various witnesses who testified about the supervision and safety policies and procedures at Charlotte Correctional Institution (CCI) at the time of the murder; family members and a former Rhode Island social worker who testified regarding his background and character; and Dr. Frederick Schaerf, an expert in forensic psychiatry, who testified that Smith had a history of depression, mood disorder, attention deficit disorder (ADD), childhood hyperactivity, low normal IQ, substance abuse, and antisocial personality disorder. Smith, 998 So.2d at 521.
The jury found Smith guilty of first-degree murder — under both a premeditated theory and a felony-murder theory— and recommended a sentence of death by a vote of nine to three. Id. at 521, 524. The trial court imposed the death sentence, finding the following aggravating factors: (1) Smith was a convicted felon under a sentence of imprisonment; (2) Smith had *1042 prior violent felony convictions; (3) the murder was committed for the purpose of escape from custody, and the victim was a law enforcement officer engaged in official duties (merged); and (4) the murder was cold, calculated, and premeditated (CCP). In mitigation, the trial court found: (1) Smith was raised by a dysfunctional, abusive family (great weight); (2) Smith expressed remorse for Officer Lathrem’s death (little weight); and (3) Smith suffered from mental and emotional health issues, including depression, ADD, and chronic substance abuse (some weight). Id. at 521-22; State v. Smith, No. 03-1526-CF (Fla. 20th Jud. Cir. order dated Aug. 18, 2006) (Sentencing Order).
Smith raised seventeen issues on appeal. This Court declined to address Smith’s claims of ineffective assistance of counsel and concluded that his remaining claims were without merit. Accordingly, this Court affirmed Smith’s conviction and sentence. Smith, 998 So.2d at 530.
In 2010, Smith filed an initial motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851. Smith raised seven claims: (1) trial counsel performed ineffectively by failing to object to testimony that Smith hoped to sexually batter a female prison guard during his escape; (2) trial counsel performed ineffectively by failing to provide the defense’s mental health expert with sufficient materials to investigate mitigation; (3) section 921.141, Florida Statutes (2006), is unconstitutional; the jury did not receive proper guidance regarding its sentencing recommendation; and trial counsel was ineffective for failing to litigate these issues; (4) Florida’s capital sentencing scheme is unconstitutionally arbitrary and capricious, and trial and appellate counsel did not effectively raise these issues; (5) Florida’s capital sentencing scheme is unconstitutional as applied pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (6) cumulative error deprived Smith of a fair trial; and (7) Smith may be incompetent at the time of his execution. The trial court conducted an evidentiary hearing on claims one and two, at which Smith called Paul Sullivan, one of Smith’s trial attorneys, and Dr. Michael Maher, a forensic psychiatrist, to testify. In rebuttal, the State called Dr. Schaerf, who had testified for the defense during Smith’s penalty phase. In 2011, the postconviction court issued an order denying relief. State v. Smith, No. 03-CF-1526 (Fla. 20th Jud. Cir. order dated Dec. 2, 2011) (Postconviction Order).
Smith appeals the postconviction court’s denial of two of his claims that trial counsel was ineffective. In addition, Smith has filed a petition for a writ of habeas corpus, raising four claims.
II. MOTION FOR POSTCONVICTION RELIEF
Smith asserts that the postconviction court should have determined that trial counsel performed ineffectively by failing to: (A) object to testimony that Smith hoped to sexually batter a female prison guard during his escape; and (B) provide Dr. Schaerf with sufficient materials to investigate mental health mitigation.
In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel’s pex'formance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As to the first prong, the defendant must establish that “counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.” Id. at 687, 104 S.Ct. 2052. For the second prong, “Strick *1043 land places the burden on the defendant, not the State, to show a ‘reasonable probability’ that the result would have been different.” Wong v. Belmontes, 558 U.S. 15, 130 S.Ct. 383, 390-91, 175 L.Ed.2d 328 (2009) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). Strickland does not “require a defendant to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Porter v. McCollum, 558 U.S. 30, 130 S.Ct. 447, 455-56, 175 L.Ed.2d 398 (2009) (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052). This Court employs a mixed standard of review, deferring to the postconviction court’s factual findings that are supported by competent, substantial evidence, but reviewing legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).
A. Evidence of Intended Sexual Battery
In his first issue on appeal, Smith asserts that the postconviction court erred in denying his claim that trial counsel was ineffective for failing to object to the portion of Smith’s recorded statement in which he stated a desire to sexually batter a female prison guard during his escape, State -witness Kenneth Christopher Ly-kins’ testimony that Smith had stated an intention to sexually batter a prison guard, and the State’s closing arguments based on this evidence. We agree with the post-conviction court that Smith has not demonstrated deficiency.
During the guilt phase, the State presented a videotape of Smith discussing the attempted escape with law enforcement officer Steve Uebelacker as they walked through the crime scene. Smith made incriminating remarks during the conversation. After initially claiming that the plan was for Eaglin to knock inmate John Bea-ston unconscious so that it would not appear that Beaston was involved in the escape, Smith admitted that the plan was actually for Smith to hit Beaston “[g]ood enough to kill him” and that if Beaston died from his injuries, Smith would mind “not one bit” and would “spit on [Bea-ston].” Smith later reiterated that before he went over the fence, his plan was to “[e]liminate” Beaston. Smith explained that regarding the guard on duty during the escape, the plan was for Smith to hold the guard and Eaglin to knock out the guard. In addition, the plan included Eag-lin “whipping” inmate Charles Fuston and taking out a gun-truck driver by hitting him in the head.
In addition, the recorded statement contained the following exchange about the guard who was on duty during the escape attempt.
AGENT UEBELACKER: You didn’t [rape her]? Why not? I mean, you talked it in the preplan, right? I mean, that that would come up?
MR. SMITH: Right.
AGENT UEBELACKER: Tell me— tell me a little about that.
MR. SMITH: Well, when I — when [Eaglin] first knocked her out she was down, and I guess my nerves, sacredness [sic] and the fear, and then when he came around and hit her again, you know — you got a — you got a six sense. You can tell if an animal is dead.
AGENT UEBELACKER: Uh-huh.
MR. SMITH: Or hurt or just out like a light.
AGENT UEBELACKER: Right.
MR. SMITH: Well, when he hit her that second time, I knew she was gone.
AGENT UEBELACKER: So — I don’t understand. So you wouldn’t do it if she was dead? I don’t understand?
*1044 MR. SMITH: No. My intentions were to get the hell out of here.
AGENT UEBELACKER: Okay. But if she — if she wasn’t dead, what would have happened? What [were] your intentions?
MR. SMITH: Well, if it was earlier, if we had — if we had time, all three would a — probably would a got some.
AGENT UEBELACKER: Yea? When you say that what do you mean?
MR. SMITH: Probably would a got some pussy.
AGENT UEBELACKER: Okay. All right. But once you — once you saw that she was — or you believe she was dead, then you didn’t want to then?....
MR. SMITH: Nah. Too much fear, scared.
The possibility of Smith sexually battering the guard on duty during the escape was also raised by guilt phase witness Lykins. Lykins, an inmate, testified that he met Smith at Union Correctional Institute in the early 1990s and that in 2003, he was moved to CCI, where he again encountered Smith. Lykins stated that he heard Smith talking “[q]uite a few times” about a plan to escape. When asked whether Smith expressed an intention to try his escape plan when a particular officer was supervising the night work crew, the following exchange occurred.
[State]: And of the officers, did the defendant ever say to you that he knew which officers were [supervising the night work crew?]
[Lykins]: Pretty much so because the same officers pretty much came back-to-back every night. Sometimes it would be a different one and sometimes it wouldn’t.
[State]: Did the defendant indicate to you that [he] wanted to try to do this escape when any particular officer was there as opposed to a different one?
[Lykins]: Yes, he did.
[State]: What did he say about that?
[Lykins]: It had to do with a female officer.
[State]: Okay. He wanted to try this when there was a female officer in the dorm?
[Lykins]: Yes.
[State]: And how often did he tell you female officers supervised that crew?
[Lykins]: Not always, but more than male officers.
[State]: Now, with regard to not just escaping but killing someone, did the defendant say anything in your presence indicating an intent to kill anyone?
[Lykins]: Yes, he has.
[State]: And what was that?
[Lykins]: It was two people, not just one.
[State]: Okay.
[Lykins]: His first he wanted to kill James Be[a]ston — well, John Be[a]ston because he felt like he snitched on him the first time when he tried to escape and had him placed back on [close management]. So, therefore, he told me before he leaves that he was gonna hit John Be[a]ston in the head with whatever he — whatever weapon that he was gonna use. But he says, I want to kill that son of a bitch before I leave prison.
And the second one is that whoever else was in the building was gonna die. His statement to me was that they didn’t want nobody to alarm no other officer or inmates and to kill everything in there so they wouldn’t have to worry about somebody trying to alert nothing while they get over the fence.
[State]: They need time to assemble this ladder, right?
*1045 [Lykins]: Of course.
[State]: What—
[Lykins]: And that — •
[State]: What—
[Lykins]: — he made a statement to me sitting on the locker the night before that if a female officer happens to be present in the dorm the night that they escape that he was gonna rape her— well, his exact words is, I’m gonna get me a piece of pussy before I leave because if I get out there and I die, at least I know I got a shotta ass before I left. And my statement was to him is, is you’re a damn fool if you kill a[n] officer in the State of Florida.
A similar exchange occurred between Ly-kins and defense counsel on cross-examination.
The State then made three references to the intended sexual battery testimony in its guilt phase closing argument. First, the prosecutor argued: “And [Smith] talked about [Lathrem] being sweet. He described her like an animal, you got a sixth sense when you know they are dead, a little earlier I would have raped her.” Later, the prosecutor added:
The defendant said if it is a female officer he was going to get a piece of you know what before he escaped, and if he died he wanted to be in that position. That is what he thinks of human life and the situation.
[[Image here]]
In cross-examination he said kill everyone in the dorm so nobody can tell or alert the officers, kill and rape a female officer before he leaves, is what Lykins heard the defendant say.
And finally, the prosecutor argued: “[Smith tells] you about you got a sixth sense, you know, you can tell when an animal is dead or not. Any time earlier probably all three would have gotten some.” The State did not present any additional evidence of Smith’s desire to sexually batter a guard or make any argument on the subject during the penalty phase.
During the postconviction evidentiary hearing, attorney Sullivan testified that because he believed the evidence was relevant and admissible, he did not file a motion in limine or object at trial to the statements that Smith hoped to sexually batter a female prison guard. Sullivan reasoned that the evidence was admissible because it was inextricably intertwined with evidence of the charged offense.
Smith contends that the evidence that he expressed a desire to sexually batter the prison guard was not relevant to the charged offense of murder and that even if relevant, the evidence was inadmissible because the probative value was substantially outweighed by the danger of undue prejudice. He asserts that reasonably competent trial counsel would have objected to the evidence or sought a limiting instruction.
We conclude, however, that the postcon-viction court did not err in denying relief. Smith’s postconviction challenge related to the admission of the intended sexual battery portion of his recorded statement is without merit. Smith’s claim fails because he has not established that a defense objection on the basis of undue prejudice would have succeeded. See Schoenwetter v. State, 46 So.3d 535, 546 (Fla.2010) (“[C]ounsel cannot be deemed ineffective for failing to make a meritless objection.”) (quoting Hitchcock v. State, 991 So.2d 337, 361 (Fla.2008)).
Contrary to Smith’s claim, the evidence that Smith hoped to commit a sexual battery was relevant, and the danger of unfair prejudice did not substantially outweigh its probative value. In Florida, *1046 “[a]ll relevant evidence is admissible, except as provided by law.” § 90.402, Fla. Stat. (2006). Evidence of a defendant’s prior bad acts, in particular, is admissible “to establish!] the relevant context in which the [charged] criminal acts occurred” and to “paint[ ] an accurate picture of the events surrounding the crimes charged.” McGirth v. State, 48 So.3d 777, 787 (Fla.2010) (internal quotations omitted; first and second alterations in original); see also Victorino v. State, 23 So.3d 87, 99 (Fla.2009) (“Dissimilar fact evidence of uncharged misconducl^-which is governed by section 90.402’s general rule of relevancy— is admissible to ‘establish! ] the relevant context in which the [charged] criminal acts occurred.’ ” (quoting Caruso v. State, 645 So.2d 389, 394 (Fla.1994))).
In addition to establishing the context of the charged offense, dissimilar fact evidence may also be relevant if it is probative of the defendant’s state of mind at the time of the charged offense. For example, in Coolen v. State, 696 So.2d 738, 742 (Fla.1997), this Court concluded that a defendant’s statement that “ ‘eight years in maximum prisons up in Massachusetts’ had taught him not to take chances” was relevant to “explain Coolen’s actions and state of mind” when he stabbed an acquaintance during an argument. This Court also has concluded that threats made by the defendant may be relevant evidence of the defendant’s motive or intent regarding the charged offense. See, e.g., Floyd v. State, 18 So.3d 432, 448 (Fla.2009) (concluding that evidence of prior death threat to victim was relevant because it demonstrated the motive behind the murder and was inextricably intertwined with the murder).
The limit on the admissibility of relevant dissimilar fact evidence is that the State is not permitted to “make the evidence of other crimes the feature of the trial or to introduce the evidence solely for the purpose of showing bad character or propensity, ... and such evidence, even if relevant, should not be admitted if its probative value is substantially outweighed by undue prejudice.” Smith v. State, 866 So.2d 51, 61 (Fla.2004); see also § 90.403, Fla. Stat. (2006) (“Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.”).
Here, the State charged Smith with first-degree murder and argued that he was guilty under a felony-murder theory and a premeditation theory. Smith in turn argued that the State did not prove that he was lawfully incarcerated for purposes of the crime of escape and that even if the escape attempt was felonious, he was only a minor participant in the felony murder— meaning he could not receive a capital sentence — and did not act with premeditation. See Tison v. Arizona, 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (holding that death penalty is permitted for felony murder if the defendant was a major participant in the felony and had reckless indifference to human life). Specifically, Smith argued that no particular guard was targeted in the escape plan, that Smith believed the guard would be incapacitated but not killed, and that Smith was merely following codefendant Eaglin’s lead.
When viewed in the context of the felony-murder charge and Smith’s defense theory, the evidence that Smith hoped to sexually batter a guard during the escape was relevant to the charged offense, not improper character evidence. Rather than merely showing a propensity for sexual violence, the evidence of the intended sexual battery demonstrated that Smith took an active role in planning the escape at *1047 tempt. Smith’s remarks about the guard showed that he had an additional, independent agenda for the escape — that is, he was not blindly following Eaglin’s lead— and that a female guard was targeted. The evidence also refuted Smith’s defense that he thought the guard on duty would be knocked out and locked in a closet without suffering further harm. Overall, the evidence that Smith hoped to commit a sexual battery was intertwined with the narrative of how Smith, Jones, and Eaglin planned their escape attempt and helped the jury evaluate the circumstances leading to the charged murder.
The fact that Smith did not act on his desire to sexually batter the guard does not change this Court’s analysis of whether the evidence of his stated intent was admissible. In Griffin v. State, 639 So.2d 966, 970 (Fla.1994), this Court concluded that similar evidence of a proposed — but not perpetrated — burglary was admissible because the “focus of [the witness’s] testimony was the events surrounding the crimes for which Griffin was on trial” and “was relevant and necessary to adequately describe the events leading up to the” charged burglary and murder. Similarly, in Peede v. State, 955 So.2d 480, 499-500 (Fla.2007), this Court concluded that a law enforcement officer’s testimony that Peede stated a desire to kill two more victims— his ex-wife and her boyfriend — was “inextricably intertwined” with the criminal episode in which he killed his current wife, who he intended to use to lure the other victims.
As in Griffin and Peede, the evidence of criminal intent in Smith’s case was presented as part of the narrative of the events leading to the charged offense. Both Smith’s recorded statement and Ly-kins’ testimony focused on the circumstances surrounding the charged offense and explained Smith’s role in planning the attempted escape — upon which the felony — murder charge was based. The statement and testimony also were probative of Smith’s intent regarding the guard on duty. Thus, the evidence that Smith hoped to sexually batter a prison guard as part of the escape was relevant to the charged homicide.
The probative value of this relevant evidence was not substantially outweighed by the danger of undue prejudice. Smith’s callous comments about the guard no doubt tended to discredit Smith. But any danger of undue prejudice did not outweigh — much less, substantially outweigh — the probative value of the evidence, which was great. As discussed above, the evidence was probative of the degree of Smith’s participation in the escape attempt and his disregard for the guard’s safety, which were disputed issues at trial and relevant to the imposition of a capital sentence.
Given this balance of probativeness versus prejudice and this Court’s precedent— which has upheld the admission of dissimilar fact evidence of completed, not merely intended, sexual batteries — it was reasonable for trial counsel to not challenge the intended sexual battery evidence on undue prejudice grounds. See, e.g., McLean v. State, 934 So.2d 1248, 1263 (Fla.2006) (concluding that trial court did not err in determining that risk of undue prejudice from evidence of prior sexual battery of a minor did not substantially outweigh its probative value where the evidence was offered to corroborate the testimony of another witness); Christopher v. State, 407 So.2d 198, 201 (Fla.1981) (concluding potential for undue prejudice from evidence of sexual relationship between defendant and his minor daughter did not substantially outweigh relevance to the defendant’s motive for murdering the child’s guardians).
*1048 B. Mental Health Mitigation
In his second issue on appeal, Smith contends that his trial counsel failed to provide certain psychiatric records from the Florida Department of Corrections (DOC) to his mental health expert. Smith asserts that the records were significant because they documented that Smith was previously diagnosed with posttraumatic stress disorder (PTSD) and that had the mental health expert been provided those records, the expert would have offered a different diagnosis or explanation of Smith’s behavior, which would have persuaded the jury and the judge to sentence Smith to life in prison.
Smith is not entitled to relief on this appellate issue because the postconviction court correctly concluded that Smith did not demonstrate that any failure to provide the l’ecords to his mental health expert resulted in prejudice. Because Smith failed to establish prejudice, we do not review the postconviction court’s conclusion that Smith failed to carry his burden of proof regarding whether trial counsel provided the DOC psychiatric records to Dr. Schaerf. See Hurst v. State, 18 So.3d 975, 996 (Fla.2009) (“The Court need not reach both Strickland prongs in every case. ‘[W]hen a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong.’ ” (quoting Preston v. State, 970 So.2d 789, 803 (Fla.2007))).
During the penalty phase, the defense called several of Smith’s relatives and a social worker who testified about the physical and sexual abuse within Smith’s family. The defense then called Dr. Schaerf, a forensic psychiatrist, to build on this testimony about Smith’s childhood. Dr. Schaerf testified that Smith was a victim of how he was raised. The doctor explained that Smith’s family was plagued by physical and sexual abuse, including incest, and that within this family, Smith did not receive any nurturing or have any role models. Dr. Schaerf explained that there was no sense of “right from wrong in the house,” just abuse. Dr. Schaerf stated that Smith “learned that coercion is the way we do things, not talking about rational understandings, not getting positive feedback” and “that you beat females.” Dr. Schaerf testified that this lack of guidance did not improve once Smith was removed from his family’s home. Rather, Smith was placed in psychiatric programs and juvenile facilities with other troubled children. Smith was then in jail or prison for all but four years of his adult life.
Based on his evaluation of Smith, interviews with individuals who knew Smith, and review of numerous documents, Dr. Schaerf informed the jury that Smith had several psychiatric disorders: a history of reoccurring depression — then currently in remission — that accounted for Smith’s six suicide attempts; ADD as a child; and substance abuse. Dr. Schaerf opined that Smith’s ADD particularly caused problems for him because his father was abusive and would punish Smith severely for any misbehavior. Dr. Schaerf additionally testified that Smith has low-normal IQ and antisocial personality disorder.
As for the attempted escape and the murder in June 2003, Dr. Schaerf testified that there was no evidence that Smith was suffering from depression at that time. Dr. Schaerf did opine, however, that Smith’s antisocial personality disorder affected Smith’s behavior at the time of the murder. Dr. Schaerf explained that due to his ADD and antisocial personality disorder, Smith’s “biology push[es]” him to act impulsively and that from a psychological standpoint, Smith suffers an “inability to really control his behavior, conform it to standards of society.” Dr. Schaerf testi *1049 fied that based on Smith’s life experience and his personality disorder, the escape and the violence were “just business as usual.” Dr. Schaerf further opined that Smith will never stop trying to escape from confinement.
At the postconviction evidentiary hearing, Smith called psychiatrist Dr. Maher, who evaluated Smith and reviewed records regarding Smith for purposes of the post-conviction proceedings. Dr. Maher agreed with Dr. Schaerfs conclusion that Smith suffers from depression, which is an Axis I disorder in the Diagnostic and Statistical Manual of Mental Disorders. Dr. Maher differed from Dr. Schaerf, however, in that he testified that — based in part on a review of the DOC psychiatric records that Smith alleges were not timely provided to Dr. Schaerf — Smith also should have been diagnosed with the Axis I disorders of anxiety and PTSD and should not have been diagnosed with antisocial personality disorder.
Dr. Maher explained that the DOC psychiatric records showed that prison medical personnel diagnosed Smith with PTSD between August 1996 and August 1999 and, at other times, with PTSD “by history,” which means that it “is a legitimate and proper diagnosis, but they don’t at the time of that visit see the symptoms of it.” Dr. Maher testified that he agreed with the PTSD diagnosis. Dr. Maher concluded that Smith developed the disorder in his childhood and that a stabbing in prison reactivated the disorder. Dr. Maher opined that while the disorder can, in some individuals, resolve itself, it “generally becomes a chronic underlying diagnosis” and in Smith’s case is likely chronic.
Dr. Maher further opined that violence during the escape attempt likely triggered Smith’s chronic anxiety and PTSD. Accordingly, Dr. Maher testified that Smith would have been under extreme emotional or mental disturbance at the time of the Lathrem murder and that while Smith understood that escaping was a criminal act, during the moments immediately leading up to Officer Lathrem’s death, Smith’s capacity to appreciate the criminality of his conduct was substantially impaired. Similarly, Dr. Maher testified that Smith had reported a history of dissociative experiences and that it was “certainly likely” that Smith would have responded to the stress of Officer Lathrem’s murder by dissociating.
In addition, Dr. Maher opined that based on Smith’s manner of speaking, the discrepancy between his verbal and performance IQ scores and his partial ambi-dextrousness, Smith more likely than not has brain damage or brain impairment. Dr. Maher suggested that this impairment could be identified by a PET or MRI scan but has been overlooked before because it is overshadowed by Smith’s psychological problems.
Finally, Dr. Maher testified that he thought it was understandable that — without the DOC psychiatric records discussed in the postconviction motion — any penalty phase expert would have concluded that Smith had antisocial personality disorder. Dr. Maher asserted, however, that the DOC psychiatric records, which document suicide attempts and psychotropic medications, would prompt a competent expert to look for an Axis I diagnosis.
In rebuttal, the State called Dr. Schaerf. Dr. Schaerf testified that he could not remember for certain if he had reviewed the DOC psychiatric records when preparing for the penalty phase. Dr. Schaerf went on to explain, however, that even assuming he had not considered the DOC psychiatric records in preparation for his penalty phase testimony, he was “not sure [that knowledge of their contents] would make a difference” to his presentation to *1050 the jury. Dr. Schaerf testified that while Smith was technically diagnosed with and treated for PTSD while incarcerated, he did not think PTSD was a “major issue” in Smith’s case and that even after reviewing the DOC psychiatric records, PTSD “wouldn’t be the [diagnosis] that I presented.”
Dr. Schaerf explained that he had doubts about the accuracy of the diagnosis of PTSD by the DOC medical personnel. Dr. Schaerf opined that in a treatment setting, a mental health practitioner may not be as strict about applying a diagnostic label to a patient as a practitioner would be in a forensic setting. A treating doctor is inclined to take a patient’s report of symptoms as accurate and try to do whatever he can to help the patient, whereas a forensic doctor must strive to reach an objectively accurate diagnosis. Dr. Schaerf also noted that rather than avoiding trauma while in prison, a symptom of PTSD, Smith was “creating it” by planning and participating in the escape attempt.
Dr. Schaerf further explained that he would not diagnose Smith as suffering from PTSD or dissociative disorder at the time of Lathrem’s murder in 2003. Dr. Schaerf stated that according to the DOC psychiatric records, Smith’s treatment for PTSD began in 1996; but in July 2000, Smith ceased taking medication for his mental health disorders, and in February 2001, he became asymptomatic and therefore ceased psychiatric treatment altogether. Dr. Schaerf testified specifically about one DOC form which indicated that when examined in 1998, Smith was diagnosed with PTSD, cocaine dependence, and antisocial personality disorder; but by the end of his treatment in February 2001, Smith’s diagnosis had changed to asymptomatic depression disorder, cocaine dependence, and antisocial personality disorder — but not PTSD.
Likewise, Dr. Schaerf testified that he did not think the failed escape attempt or murder triggered Smith’s PTSD or a dissociative disorder. Dr. Schaerf explained that during their 2006 clinical interview, Smith did not report any symptoms that prompted Dr. Schaerf to consider PTSD or dissociative disorder as proper diagnoses. Dr. Schaerf testified that avoidance or phobia is an element of a diagnosis of PTSD, but while Smith reported some harassment by prison guards following the murder, Smith did not report any other physical or psychological distress on work details or a need to avoid situations that would remind him of the murder of Officer Lathrem.
Dr. Schaerf testified that because he did not think Smith was suffering from PTSD at the time of the murder, he could not ethically make it a major focus of the penalty phase mitigation presentation. Dr. Schaerf stated: “I don’t think I would tell you that PTSD was one [diagnosis] that I would have focused on even if I included it as PTSD in remission.” The doctor summarized:
Would I put [the diagnosis of PTSD] in today in the presentation?
Pm not sure it would make a difference. Because when I interviewed Mr. Smith several times and gave him ample opportunity to discuss his full symptoma-tology and do a full forensic psychiatric evaluation, he really had no symptoms of post-traumatic stress disorder. He didn’t have symptoms ongoing of a major depression.
So the only thing that I think with diagnostic specificity and certainty would be that he suffered from his antisocial personality disorder and he was confined in a prison setting and the other things were not a real act of disease. Yes, there are some things in remission.
[[Image here]]
*1051 The only other thing I would add is that you could debate whether the other active diagnoses were some of his intellectual vulnerabilities that have been debated through his life, as well, in terms of does he have more aligned actual functioning at that testing, does he have low or average IQ and those kinds of things.
Smith’s argument for prejudice is that if his trial counsel had called a mental health expert who could have provided a nexus between Smith’s childhood and his mental state at the time of the crime, the judge and the jury would have realized how Smith was harmed by his background and would have found more mitigation. Specifically, Smith asserts that testimony that the abuse Smith suffered as a child and the violence he experienced in prison caused him to experience PTSD, as documented by the DOC psychiatric records, would have established additional mitigation. Smith’s argument is without merit.
First, Smith did not prove prejudice because he did not establish that as a result of being provided with the DOC psychiatric records, a reasonably competent mental health expert would have offered materially different testimony during the penalty phase than did Dr. Schaerf. While Dr. Maher testified that he believes that due to chronic PTSD, Smith was under extreme or emotional mental disturbance at the time of the Lathrem murder and had a substantially impaired capacity to appreciate the criminality of his conduct, Dr. Schaerf testified that even if he had reviewed the DOC psychiatric records, he would not have diagnosed Smith as suffering from PTSD at the time of the murder. Dr. Schaerf explained that Smith ceased receiving psychiatric treatment more than two years before the Lathrem murder and that according to the DOC records, as of February 2001, PTSD was no longer an active diagnosis for Smith. Dr. Schaerf further explained that he did not think Smith was suffering from PTSD at the time of the murder because instead of “avoiding trauma, [Smith was] creating it.” Even after reviewing the DOC psychiatric records, Dr. Schaerf concluded that he could not ethically make PTSD a major focus of the mitigation presentation.
In similar cases where a defendant asserted that counsel failed to provide relevant records to the defense’s mental health expert, this Court concluded that the defendant did not prove prejudice where the mental health expert testified that the information would not have materially changed his evaluation or testimony. See, e.g., Gaskin v. State, 822 So.2d 1243, 1250 (Fla.2002) (“[B]ecause Dr. Krop testified at the evidentiary hearing that his diagnosis of Gaskin would have changed little if counsel had given him Gaskin’s school records, Gaskin has not met his burden of showing that but for counsel’s alleged deficiency, the result of the penalty phase would have been different.”); Carroll v. State, 815 So.2d 601, 612-13 (Fla.2002) (“Dr. Gutman also reiterated that Carroll has a ‘malingering-like persona’ and that his diagnosis of malingering would still be present. Thus, even if we were to assume trial counsel was deficient for failing to provide the additional background information, ... Carroll has failed to demonstrate prejudice.”) (footnote omitted); Breedlove v. State, 692 So.2d 874, 877 (Fla.1997) (“[B]oth psychologists ... stated at the postconviction hearing that although additional information from Breedlove’s counsel might have been helpful, their opinions were unchanged.... In light of these opinions, we do not conclude that ... there is a reasonable probability that the result of the penalty phase would have been different.”).
*1052 Second, Smith is not entitled to relief as a result of Dr. Maher’s more favorable postconviction testimony. See Cherry v. State, 781 So.2d 1040, 1052 (Fla.2000) (“The fact that Cherry found a new expert who reached conclusions different from those of the expert appointed during trial does not mean that relief is warranted.”). In this case, while Dr. Maher disagreed with some of Dr. Schaerf s diagnostic conclusions, Dr. Maher also conceded that— based on Smith’s behavioral and criminal history — it was “understandable” that a mental health expert without access to the DOC psychiatric records would diagnose Smith with Axis II antisocial personality disorder rather than an Axis I disorder. Similarly, while Dr. Maher testified that Smith’s manner of speaking, verbal and performance IQ scores, and partial ambi-dextrousness were “broad indicator[s]” of brain damage or brain impairment and suggested that the brain deficiency perhaps could be identified by a PET or MRI scan, Smith did not present such a scan to establish the brain impairment allegedly overlooked by Dr. Schaerf. Moreover, Dr. Maher again stopped short of labeling Dr. Schaerfs evaluation inadequate, instead explaining that the possible brain impairment would be difficult to diagnose due to Smith’s “psychological, emotional, social, and other symptoms that he has acquired through his life beginning from childhood.”
Third, the record supports the postcon-viction court’s conclusion that “[e]ven had the diagnosis of PTSD by Department of Corrections staff, or any of the other 14 diagnos[e]s made by those staff, been presented to the jury, there is no reasonable probability of a different outcome.” Post-conviction Order at 10. Dr. Maher’s testimony about the conclusions of the DOC doctors and his opinion that the escape attempt and murder “likely” triggered Smith’s PTSD and dissociative disorder do not undermine confidence in Smith’s death sentence.
In this case, the jury heard evidence that Smith beat to death an elderly woman, kidnapped and sexually assaulted a minor, sexually assaulted his sister, and— while serving multiple life sentences — participated in an escape attempt which involved killing a guard and an inmate. Smith, 998 So.2d at 521. The jury also heard Smith’s recorded statement, in which he admitted that the plan for the escape involved beating the guard on duty, beating an inmate, killing another inmate, and attacking the gun-truck driver. In addition, the defense expert, Dr. Schaerf, informed the jury that in his opinion, Smith will never stop trying to escape from confinement. Given this record, Smith’s claim that jurors would recommend that Smith be returned to the general prison population as a result of hearing evidence that Smith may have chronic PTSD and dissociative disorder is patently unrealistic.
Smith has likewise failed to establish that Dr. Maher’s testimony about PTSD and dissociative disorder would prompt the sentencing judge to impose a lesser sentence. While the sentencing judge did not find any statutory mitigation in Smith’s case, the judge gave great weight to the mitigating factor that Smith was raised by an abusive family and gave some weight to the additional, interrelated factor of mental and emotional health issues. These weights indicate that the sentencing judge appreciated that Smith’s background affected his behavior, even without a mental health expert expressly tying Smith’s childhood abuse to a current mental health diagnosis. Furthermore, the sentencing judge concluded that the four aggravating factors in this case — under sentence of imprisonment, prior violent felony, committed for purpose of effecting an escape, *1053 and CCP — greatly outweighed the mitigating circumstances. Given these assessments of weight, our confidence in the trial court’s conclusion is not undermined by the possibility of additional evidence about the effect of Smith’s childhood on his mental status.
III. PETITION FOR WRIT OF HABEAS CORPUS
In his petition for a writ of habe-as corpus, Smith asserts that: (A) Florida’s capital sentencing scheme is unconstitutional as applied; (B) Florida’s capital sentencing scheme is unconstitutionally arbitrary and capricious, and trial and appellate counsel did not effectively raise this issue; (C) cumulative errors have deprived Smith of a fair trial; and (D) Smith may be incompetent at the time of his execution, The majority of these claims are not cognizable in a petition for habeas relief, and Smith’s properly raised claim of ineffective assistance of appellate counsel is without merit.
“[W]hile habeas corpus ... [is] still used in the postconviction process, [its] use is somewhat limited.” State ex rel. Butterworth v. Kenny, 714 So.2d 404, 409 (Fla.1998) (plurality opinion) (footnote omitted), receded from on other grounds by Darling v. State, 45 So.3d 444 (Fla.2010). Since the adoption of Criminal Procedure Rule No. 1 in 1963, “habeas corpus may not be used as a substitute for an appropriate motion seeking postconviction relief.” Baker v. State, 878 So.2d 1236, 1241 (Fla.2004) (quoting Harris v. State, 789 So.2d 1114, 1115 (Fla. 1st DCA 2001)). Rule No. 1—the predecessor to Florida Rules of Criminal Procedure 3.850 and 3.851—established a process by which collateral attacks on criminal convictions and sentences may be presented in the trial court that imposed the conviction and sentence. See In re Criminal Procedure Rule No. 1, 151 So.2d 634, 634 (Fla.1963). In adopting Rule No. 1, this Court explained that the procedure was intended to supplant most uses of the writ of habeas corpus.
An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this rule, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.
Id. at 635. Rules 3.850 and 3.851 — which permit initial and, in some circumstances, successive postconviction motions — continue to provide an avenue for litigating most collateral attacks to a conviction or sentence. “Habeas corpus should not be used as a vehicle for presenting issues which should have been raised at trial and on appeal or in postconviction proceedings. The habeas process is therefore most often used in death penalty cases to challenge the effectiveness of appellate counsel.” Wright v. State, 857 So.2d 861, 874 (Fla.2003) (citation omitted).
Smith’s claims that Florida’s capital sentencing scheme is unconstitutional as applied; that Florida’s capital sentencing scheme is unconstitutionally arbitrary and capricious, and trial counsel did not effectively raise this issue; and that cumulative errors resulted in an unfair trial all could have been — and in fact were — raised in his postconviction motion. Thus, they are not properly presented in a petition for a writ of habeas corpus.
Smith’s claim that he may be incompetent at the time of execution is likewise not cognizable. Such a claim can only be raised after a death warrant has been signed. See Fla. R.Crim. P. 3.811(c) (2013) *1054 (“No motion for a stay of execution pending hearing, based on grounds of the prisoner’s insanity to be executed, shall be entertained by any court until such time as the Governor of Florida shall have held appropriate proceedings for determining the issue pursuant to the appropriate Florida Statutes.”); Green v. State, 975 So.2d 1090, 1115-16 (Fla.2008) (“This claim is premature because a claim of incompetency to be executed cannot be asserted until a death warrant has been issued, and no death warrant has been issued in this case.”).
Smith’s habeas petition raises only one cognizable claim: his claim that appellate counsel performed ineffectively. Smith contends that appellate counsel should have argued on direct appeal that Florida’s capital sentencing scheme is unconstitutionally arbitrary and capricious. Smith has not shown that appellate counsel was deficient. This Court has rejected the arguments that Florida’s death penalty scheme fails to prevent the arbitrary and capricious imposition of death sentences by sufficiently narrowing application of the penalty and that it constitutes cruel and unusual punishment. See, e.g., Lugo v. State, 845 So.2d 74, 119 (Fla.2003). Because Smith’s challenges to Florida’s death penalty scheme are meritless, appellate counsel did not err by failing to raise the arguments on direct appeal and Smith is not entitled to habeas relief. See Davis v. State, 928 So.2d 1089, 1131 (Fla.2005) (“[A]ppellate counsel should not be deemed deficient for failing to raise this meritless issue on appeal.”).
IV. CONCLUSION
For the reasons stated above, we affirm the circuit court’s denial of Smith’s motion for postconviction relief and deny his petition for a writ of habeas corpus. It is so ordered.
POLSTON, C.J., and LEWIS, CANADY, LABARGA, and PERRY, JJ., concur. PARIENTE, J., concurs in result with an opinion, in which QUINCE, J., concurs.