# Supreme Court of Florida

———————

No. SC13-717
———————

**TODD ZOMMER,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

———————

No. SC13-1675
———————

**TODD ZOMMER,**
Petitioner,

vs.

**JULIE L. JONES, etc.**
Respondent.

[January 15, 2015]

PER CURIAM.

Todd Zommer appeals an order of the circuit court that denied his initial motion to vacate his conviction of first-degree murder and sentence of death filed pursuant to Florida Rule of Criminal Procedure 3.851.  He also petitions this Court

for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla.

Const. For the reasons that follow, we affirm the postconviction court's denial of

relief on all claims and deny Zommer's petition for a writ of habeas corpus.

## FACTS AND BACKGROUND

Todd Zommer was convicted and sentenced to death for the first-degree

murder of Lois Corrine Robinson, a seventy-seven-year-old woman. Zommer v.

State, 31 So. 3d 733, 737 (Fla. 2010).[1] In affirming Zommer's conviction, this

Court detailed the facts surrounding the murder:

> [O]n April 12, 2005, the body of Robinson was discovered in
> her Kissimmee home after an officer from the Osceola County
> Sheriff's Office (OCSO) conducted a wellness check at the request of
> a neighbor. Robinson's vehicle was missing, and the level of
> decomposition indicated that she had been dead for several days. The
> same day, Kissimmee police officers spotted Robinson's vehicle and,
> having been advised that the vehicle was sought in reference to a
> homicide, attempted to initiate a traffic stop. The driver of the vehicle
> accelerated with officers in pursuit until the vehicle crashed. After a

---

1. Zommer was also charged with attempted first-degree murder, robbery, aggravated battery with a deadly weapon, grand theft of a motor vehicle (three counts), grand theft (two counts), uttering a forgery, fleeing and eluding at high speed or with wanton disregard, resisting an officer without violence, possession of drug paraphernalia, and leaving the scene of an accident with property damage. Zommer, 31 So. 3d at 737. Some of these crimes occurred during a separate incident in which Zommer struck Edgardo Fuentes with a vehicle. Id. at 740. During trial, Fuentes testified that he was crossing a parking lot when he was struck from behind by a vehicle. Id. Fuentes hit the windshield and flipped over the car. Id. When he regained his composure, he saw two men, one of whom was Zommer, approach him. Id. The two men started kicking Fuentes, stole his wallet, and fled in the vehicle. Id. at 741. Prior to the commencement of trial, Zommer pled guilty to all counts except the murder charge. Id. at 737.

brief foot chase of the occupant, Todd Zommer was arrested and taken into custody.

In the days following the murder, Zommer admitted to numerous people that he killed Robinson. The four admissions were to: (1) Joanne and James Vella, a mother and son with whom Zommer consumed drugs for a five-day period surrounding the time of the murder; (2) Matthew Druckenmiller, another acquaintance with whom Zommer consumed drugs; (3) a reporter for an Orlando television station; and (4) OCSO detectives. A large portion of Zommer's statement to OCSO was suppressed by the trial court because the detectives had failed to correct an inaccurate assumption by Zommer that if he invoked his right to counsel he would be required to wait eight months for counsel to be appointed.

The details of the murder were thoroughly developed through Zommer's statements, testimony from witnesses, and Zommer's trial testimony. From time to time, Zommer would live with a neighbor of Lois Corrine Robinson (the same neighbor who requested that OCSO conduct a wellness check for Robinson). On Saturday, April 9, 2005, the neighbor told Zommer during a telephone conversation that Robinson had agreed to loan Zommer twenty dollars for gas. Zommer walked to Robinson's house to obtain the money and, when she opened the door, Zommer believed that Robinson recognized him as the individual who had stolen a boat from a neighbor's yard. Zommer accepted the twenty dollars from Robinson, left the premises, but then later returned. During his interview with the television reporter, Zommer described the event:

> ZOMMER: I killed the lady, Corrine, you know, because she wouldn't mind her business, for one. . . . In the life that I live, she should've minded her business. That's what she shoulda did.
> . . . .
>  . . . I didn't realize how old she was or—you know, that's not a factor and, you know, the fact that she was a female didn't matter. It's just the fact that she had saw me do something, and she should have minded her business and she didn't. You know, it's just like anything else in the world.
>
> REPORTER: What did she see you do?

ZOMMER: She seen me robbing—stealing something.

. . . .

. . . [W]hen I went over there that day to meet her, I finally meet her, the recognition was there.

. . . .

REPORTER: So is that why you killed her?

ZOMMER: Basically, yeah, to shut her up. Tell her mind her business. You know, when I was beating her, that's what I was telling her, too. "Now, you wanna talk, you wanna yell? Yell now. You wanna tell on somebody? Tell now."

When Zommer returned to the Robinson home, she began showing Zommer items that she collected. As Robinson was exhibiting her items, Zommer picked up a wooden instrument referred to as a ukelin and struck her over the head. According to Zommer, "she bounced back a little bit. And was like, 'Oh, my God. What was that?' And I said, 'It was your ceiling.' And when she looked up, I hit her again." Zommer struck Robinson repeatedly with the ukelin until it shattered. Zommer then hit Robinson with a hurricane lamp. He next obtained the cord from a computer mouse and placed it around Robinson's neck as he attempted to strangle her. During the attack, Robinson scratched and resisted. The mouse cord ripped several times, and Zommer later told Matthew Druckenmiller that "it was hard to choke somebody when their fingers were in the way." When the cord ripped, Zommer stopped the attack for a urination break. After the bathroom break Zommer again attacked Robinson, stepping on her head in the process. Then:

I think I kicked her in the face. I don't think I punched her at all; I just think I kicked her. And then she was kind of like flopping around. I hate to say that, but she was—every time I kicked her, she'd moved to one spot and I'd kick her and I'd get in the other—I think I kicked her twice.

Zommer then stopped the attack and walked into the kitchen for a cool drink from the refrigerator. While in the kitchen, Zommer

noticed a block of knives on the counter.  Zommer fully described (during the television interview) the attack when he stated:

> I went in the kitchen, got a knife and came back and lifted her throat up, stood behind her. . . .  I straddled her, and lifted her head back and just sliced it, chu, chu, chu, chu.
> And then I dropped her head and she gurgled and I kicked her again.  And I sat and I watched her and I made sure she wasn't breathing.

Zommer admitted to one of the Vellas that he first attempted to cut Robinson's throat with his left hand to make it appear that a left-handed person had committed the murder.  When the left-hand attempt did not work, Zommer confirmed that he had to use his right hand.  He cut so deep into her throat that he could hear the knife hitting the bones.  Zommer informed the reporter that after the murder:

> I went home, took everything off, put it in a bag, ate, went back over there, got her car and drove her car down the street, walked back home, went back over there and made it look like a robbery.  And within that time frame, I threw the shoes and stuff away.

When asked by the reporter if he was under the influence of drugs at the time of the murder, Zommer replied that he was "sober as f**k."

Subsequent to his arrest (and his confession to OCSO detectives) Zommer led the police to a dumpster where a plastic bag was recovered which contained bloody sneakers, socks, and a towel.  A DNA analyst for the Florida Department of Law Enforcement (FDLE) testified that the blood on the sneakers and socks matched the known DNA profile of Robinson.  A swab from the inside of one of the socks revealed DNA that matched the known DNA profile of Zommer at all thirteen relevant locations on the DNA strand.  The analyst testified that the likelihood of randomly selecting a DNA profile of a Caucasian male who matched the DNA sample taken from the sock was one in 25 quadrillion.  Further, an FDLE footprint analyst testified that the sneakers recovered from the dumpster

exhibited design characteristics similar to a footprint impression that appeared on the back of the shirt that Robinson was wearing at the time of her death.

An associate medical examiner concluded that the cause of death was a large incised wound to Robinson's neck with massive hemorrhaging. The examiner determined that there were at least two incised wounds to the neck. One of the wounds was deep enough that it extended to Robinson's backbone, and the examiner explained it would have required a significant amount of force to cut through the blood vessels and tissues of the neck to reach bone. The wound was consistent with someone pulling the victim's head back and making the incision with a sharp object, such as a blood-stained knife that was recovered from Robinson's kitchen. The examiner noted that there were defensive wounds on the victim's hands. Further, Robinson had contusions and abrasions on the front and back of her body as well as her head, and the examiner concluded that the number of injuries was consistent with someone struggling against an attacker for a period of several minutes. The examiner opined that the head injuries were inflicted before the fatal neck wound because circulation to the head would have continued to develop the contusions found. The examiner testified that all of Robinson's injuries (other than the neck wound) could not have been caused by a single blow and a fall. Moreover, these blows would not have rendered her immediately unconscious, but may have left her stunned and disoriented.

Todd Zommer testified in his own defense. Although he described the murder in great detail, his testimony during trial differed from his prior statements in three main respects. First, Zommer testified at trial that he smoked crack cocaine before returning to Robinson's house; therefore, he was high at the time of the murder. Second, Zommer asserted during trial that he did not kill Robinson because she had witnessed him stealing a boat. Instead, he asserted that the only reason he returned to Robinson's home was because he was high and wanted to talk to someone. On cross-examination, he stated that he falsely admitted to stealing the boat to protect one of his friends. He also claimed that he fabricated the boat-theft motive because the inmates at the jail wanted to "kick my ass" and he had to "come up with a reason that's plausible for inmates to accept the fact that I killed a 77-old-woman [sic]." When asked why he commenced and continued the attack on Robinson, Zommer professed that he did not know, and could not provide a reason for his actions. Zommer

- 6 -

also testified that the night before the murder, he had unsuccessfully attempted to contact a childhood acquaintance because he felt that his life was coming unraveled and he was experiencing homicidal thoughts. Third, Zommer contended during trial testimony that Robinson appeared to be unconscious after he struck her with the lamp, that she never fought him during the attack, and that she never used her hands in an attempt to block the mouse cord from strangling her.

During cross-examination, Zommer was impeached with the following statements:

> I woke up that morning and I said, you know, what? I'm just gonna—I'm going all out. F**k it. Can't stand her. I don't even know her, dude. The . . . hate, you know, it builds up. . . . I'm sorry that she's seventy-seven years old. It has nothing to do with it. It's not an age. . . . It could have been a nineteen-year-old. . . . I don't think it would have mattered at that straight time. And the sad thing about it, it felt so good. You know, what I'm saying?
> . . . .
> I knew right as soon as I saw [the ukelin], that's what I was going to use. . . . I said "Why don't you get up and walk me around your house." What I really was doing is checking out who could see through what. . . . I said, "Why don't you show me your dolls, dah, dah, dah." And I'm walking around, the whole time I've already planned it in just the right spot.
> . . . .
> She started rolling around and grabbing my leg and s* *t. And I'm like, "Get the f**k off me, you snitching bitch." And this has motivated me to keep doing it.
> . . . .
> I went berserk, dude. But then I remember going in the kitchen looking for a knife. . . . And I always told myself, it would be f**king so cool to f**king slice the bitch's head off. . . .
> So I went in the f**king kitchen. I got me this long ass f**king knife, and I stood over her like a f**king cowboy riding her like this, and I was f**king

yanking her, yanking her. And not thinking of nothing
but getting my s**t. . . . It wasn't the fact she's a woman
or older, anything like that. It was the fact the bitch seen
me doing something I got caught doing.

Id. at 737-40. Zommer was convicted of murder and the jury recommended a

sentence of death by a vote of ten to two. Id. at 740. As a basis for imposing the

death sentence, the trial court determined that the State had proven beyond a

reasonable doubt the existence of four statutory aggravators: (1) Zommer had

previously been convicted of a felony involving the use or threat of violence to the

person (the three convictions for crimes against Edgardo Fuentes, which the trial

court treated as one prior violent felony) (significant weight); (2) the murder was

committed for the purpose of avoiding lawful arrest (great weight); (3) the murder

was especially heinous, atrocious, or cruel (HAC) (great weight);[2] and (4) the

murder was cold, calculated, and premeditated (CCP) (great weight). Id. at 743.

The trial court found no statutory and ten nonstatutory mitigating

circumstances: (1) Zommer had a deprived childhood and a dysfunctional family

(moderate weight); (2) Zommer has a history of drug abuse and dependence (little

weight); (3) Zommer has exhibited good conduct while incarcerated (little weight);

---

2. The trial court noted that the "truly heinous, atrocious and cruel manner
in which this murder was committed standing alone, even in the absence of the
other aggravating circumstances, [was] sufficient to far outweigh the mitigating
circumstances in this case." Zommer, 31 So. 3d at 744.

(4) Zommer can be productive in prison (little weight); (5) society will be protected by the imposition of a life sentence (little weight); (6) Zommer accepted responsibility for his actions during trial (little weight); (7) Zommer suffers from mental health disorders that do not rise to the level of a major mental illness (little weight); (8) Zommer was protective of his mother and his younger brother (little weight); (9) Zommer was in special education classes and experienced difficulty in school as a child, but eventually obtained a GED (little weight); and (10) Zommer attempted to contact Danny Newell[3] on the night before the murder to tell him about having homicidal thoughts (moderate weight). Id. at 743-44.

On direct appeal, Zommer presented five claims. Specifically, Zommer alleged that: (1) the trial court erred in finding the CCP aggravating circumstance; (2) the trial court erred in finding the HAC aggravating circumstance; (3) the trial court failed to properly interpret the statutory mitigating evidence offered and failed to correctly apply the law with regard to such mitigation; (4) the sentence of death was disproportionate; and (5) various provisions of Florida's death penalty law were unconstitutional. Id. at 744-54. This Court denied relief on all claims

---

3. Danny Newell served as a child care worker while Zommer resided at a children's center. Zommer, 31 So. 3d at 741. After Zommer left the center, he maintained contact with Newell. Id. Newell confirmed that on the day before the murder, Zommer left a distressed message and stated that he wanted to speak with Newell. Id. However, Zommer did not explain the nature of his problem. Id.

and affirmed Zommer's conviction and sentence. Id. at 754. The United States Supreme Court denied certiorari review on October 4, 2010. Zommer v. Florida, 131 S. Ct. 192 (2010).

**Postconviction Proceedings**

On September 20, 2011, Zommer filed a motion for competency determination and a motion for postconviction relief. The postconviction court appointed three experts to evaluate Zommer and determine whether he was competent to proceed during the postconviction proceedings. After a hearing, the postconviction court concluded that Zommer was competent to proceed.

In his postconviction motion, Zommer presented the following claims: (1) trial counsel performed ineffectively when they failed to: (a) move for a competency evaluation during trial; and (b) ask the trial court to instruct the jury that he was under the influence of psychotropic drugs during trial; (2) trial counsel performed ineffectively when they failed to adequately present evidence of his extensive drug use before and during the offense; (3) trial counsel performed ineffectively when they failed to rehabilitate Dr. Danziger on redirect examination; (4) cumulative error; (5) section 921.141, Florida Statutes (2005), is facially vague and overbroad in violation of the Eighth Amendment, and trial counsel performed ineffectively to the extent they failed to present this issue; (6) Zommer's Eighth Amendment right to be free from cruel and unusual punishment could be violated

because he may be incompetent at the time of execution; (7) Florida's capital sentencing statute is unconstitutional as applied pursuant to Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002); and (8) Florida's capital sentencing statute is unconstitutional on its face and as applied because it fails to prevent the arbitrary and capricious imposition of the death penalty.

The postconviction court granted an evidentiary hearing on claims 1, 2, and 3, and reserved ruling on claims 4 through 8. The evidentiary hearing was held on January 30, 2013.

Zommer presented one witness, Dr. Michael Maher, a psychiatrist, who testified that Zommer's mental health history supported a diagnosis of bipolar disorder and substance abuse disorder. He further explained that both bipolar disorder and substance abuse disorder are characterized by the Diagnostic and Statistical Manual of Mental Disorders as Axis I disorders, while personality disorders such as antisocial personality disorder are classified as Axis II disorders. Dr. Maher testified that to reach a valid Axis II diagnosis, the individual must exhibit identifiable, enduring personality qualities and characteristics during adulthood that are not caused by, or directly attributable to, an Axis I disorder. In other words, according to Dr. Maher, there is no justification for an Axis II disorder diagnosis where the symptoms are better described by an Axis I disorder.

Dr. Maher testified that, for a significant period of time, Zommer was married and involved in a responsible family relationship and did not demonstrate any antisocial personality characteristics. He believed that the patterns of rule breaking and violence displayed by Zommer could be attributed exclusively to the manic episodes that arose as part of Zommer's bipolar disorder. Thus, Dr. Maher testified that while he agreed with the penalty phase testimony of psychiatrist Dr. Jeffrey Danziger, who concluded that Zommer suffered from bipolar and substance abuse disorders, he disagreed with Dr. Danziger's diagnosis of antisocial personality disorder. Dr. Maher additionally concluded that Zommer's outbursts during trial were characteristic of a person who is in a manic state of bipolar disorder that was not fully suppressed by medication.

The State presented four witnesses. Patricia Cashman and Kelly Sims, the attorneys who represented Zommer during trial, testified in detail regarding their relationship with Zommer, how they addressed his mental illness and behavioral outbursts during trial, the extent of their mitigation investigation, and their strategy during trial—particularly during the penalty phase. Cashman and Sims further explained why they decided not to: (1) request a jury instruction regarding Zommer's use of psychotropic medications; or (2) attempt to impeach on redirect examination the diagnosis of antisocial personality disorder by Dr. Danziger.

Toni Maloney, a private investigator, testified that she helped Cashman and Sims collect the records requested by the mental health experts. She spoke with Zommer several times and was aware that he had consumed drugs before the murder and confessed his involvement in the murder on multiple occasions.

Finally, the State presented Dr. Danziger, who reaffirmed his conclusion that Zommer suffered from bipolar disorder, substance abuse disorder, and antisocial personality disorder. He testified that Axis I and Axis II diagnoses are not mutually exclusive, and, therefore, individuals may be concurrently diagnosed with both bipolar disorder and antisocial personality disorder. Dr. Danziger further added that Zommer had long-standing problems, dating back to childhood, which demonstrated that Zommer met all the major criteria for antisocial personality disorder.

For example, before the age of twelve, records indicate that Zommer engaged in antisocial and destructive behaviors such as setting fires, running away, and threatening his family members. Dr. Danziger explained that these behaviors manifested before the age of fifteen, and the doctors who treated him at that time diagnosed Zommer with conduct disorder. According to Dr. Danziger, Zommer exhibited a pattern of destructive, goal-driven behavior, which is generally inconsistent with the behavior displayed by individuals who behave unlawfully during the manic episodes of bipolar disorder. He further explained that it is not

uncommon for individuals with antisocial personality disorder to have sustained periods in their lives during which they are productive and responsible members of society. That period of law-abiding conduct, however, does not preclude a finding of antisocial personality disorder. Accordingly, Dr. Danziger concluded that Zommer suffered from antisocial personality disorder because he could not conclude that the aggressive and illegal behavior exhibited by Zommer was exclusively attributable to, or better explained by, bipolar disorder.

On March 28, 2013, the postconviction court issued an order denying all claims. This appeal follows.

## ANALYSIS

### Strickland Standard of Review

Zommer's first two claims challenge the postconviction court's determination that counsel did not perform ineffectively during the guilt phase of his trial. This Court recently described what a defendant must establish to succeed on a claim of ineffective assistance of trial counsel:

> [T]he test when assessing the actions of trial counsel is not how, in hindsight, present counsel would have proceeded. See Cherry v. State, 659 So. 2d 1069, 1073 (Fla. 1995). On the contrary, a claim for ineffective assistance of trial counsel must satisfy two criteria. First, counsel's performance must be shown to be deficient. Strickland v. Washington, 466 U.S. 668, 687 (1984). Deficient performance in this context means that counsel's performance fell below the standard guaranteed by the Sixth Amendment. Id. When examining counsel's performance, an objective standard of reasonableness applies, id. at 688, and great deference is given to counsel's performance. Id. at

689.  The defendant bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  This Court has made clear that "[s]trategic decisions do not constitute ineffective assistance of counsel."  See Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000).  There is a strong presumption that trial counsel's performance was not ineffective.  See Strickland, 466 U.S. at 669.

Second, the deficient performance must have prejudiced the defendant, ultimately depriving the defendant of a fair trial with a reliable result.  [Id. at] 689.  A defendant must do more than speculate that an error affected the outcome.  Id. at 693.  Prejudice is met only if there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  Both deficient performance and prejudice must be shown.  Id.

Bradley v. State, 33 So. 3d 664, 671-72 (Fla. 2010).

Ineffective assistance claims are evaluated under a mixed standard of review because the performance and prejudice prongs of Strickland present mixed questions of law and fact.  Id. at 672.  Postconviction courts hold a superior vantage point with respect to questions of fact, evidentiary weight, and observations of the demeanor and credibility of witnesses.  See Cox v. State, 966 So. 2d 337, 357-58 (Fla. 2007).  As a result, this Court defers to the postconviction court's factual findings so long as they are supported by competent, substantial evidence.  See Bradley, 33 So. 3d at 672.  However, this Court reviews the postconviction court's legal conclusions de novo.  Id.  Finally, because Strickland requires that a defendant establish both deficiency and prejudice, an appellate court

- 15 -

evaluating a claim of ineffectiveness is not required to issue a specific ruling on

one component of the test when it is evident that the other component is not

satisfied.  See Mungin v. State, 932 So. 2d 986, 996 (Fla. 2006).

## Psychotropic Drug Instruction

In his first claim, Zommer contends trial counsel performed deficiently when

they failed to request that the court instruct the jury that Zommer's presence during

trial was aided by the use of psychotropic drugs.

Florida Rule of Criminal Procedure 3.215(c) provides that:

> **(c) Psychotropic Medication.** A defendant who, because of
> psychotropic medication, is able to understand the proceedings and to
> assist in the defense shall not automatically be deemed incompetent to
> proceed simply because the defendant's satisfactory mental condition
> is dependent on such medication, nor shall the defendant be prohibited
> from proceeding solely because the defendant is being administered
> medication under medical supervision for a mental or emotional
> condition.
> . . . .
> (2) If the defendant proceeds to trial with the aid of medication
> for a mental or emotional condition, on the motion of defense counsel,
> the jury shall, at the beginning of the trial and in the charge to the
> jury, be given explanatory instructions regarding such medication.

(Emphasis supplied.)  While Zommer does not contend that his competency during

trial was dependent on medication, he claims that the medication prevented the

jury from observing his true demeanor.  Specifically, Zommer contends that two

mental health experts testified he was suffering from symptoms of mental illness—

such as episodes of mania and depression—which the jury did not observe because

- 16 -

those symptoms were masked by medication. He claims that counsel should have requested the jury be instructed that medication suppressed his ability to manifest these symptoms. As a result, the jury may have discounted the credibility of the mental health experts.

During the evidentiary hearing, both Cashman and Sims testified that they discussed with the mental health experts and Zommer whether they should request the explanatory jury instruction. Based upon prior experiences, Cashman testified that the defense ultimately decided not to request the instruction:

> We were concerned how the jury would take that and that they would hold it against him, be scared of him, think he was crazy. I mean, [Zommer] . . . was a little bit on edge, as it was, while medicated. And if the jury saw that, they could be fearful that, if he's that way on meds, what if he gets off 'em? You know, what if this happens again? And, you know, as a defense attorney you worry about jurors who are scared of the mentally ill, because there's no cure for it, all you can do is control it.

Cashman further testified the defense was concerned that an instruction, or the presentation of expert testimony regarding the medication of Zommer during trial, could have led to the disclosure of information about Zommer that would not have been well received by the jury. Similarly, Sims testified that the defense made a strategic decision not to request the explanatory instruction because

> [Zommer] barely looked under control, and if we were to tell somebody that he's under control based on psychotropic medications, there might be great worry in the jury if [Zommer] would ever get out or [Zommer] would ever . . . get into a more free setting within the jails, you know, that would come with a life sentence . . . .

Sims explained that during the guilt phase, Zommer always appeared to be "straining at the leash, even with the best medication," and the defense did not want the jury to conclude that they "had some wild animal" that needed psychotropic medications to stand trial. He noted that even with medication, Zommer "seemed dangerous" and had multiple outbursts where the jury heard his comments and saw his reactions to witness testimony.[4]

The facts established during the evidentiary hearing demonstrate that both of Zommer's trial attorneys thoroughly considered whether to request a jury instruction to explain that Zommer's presence during trial was aided by psychotropic medications. However, after consulting with multiple mental health experts, and relying on their previous experiences under similar circumstances, counsel determined not to request such an instruction because they were concerned

---

4. Zommer additionally claims that counsel performed deficiently because counsel knew that the facts presented during trial demonstrated that Zommer would likely be convicted of murder, yet they attempted to justify their decision not to request the instructions on the basis that the jury might fear that Mr. Zommer would someday be released from prison. Cashman and Sims testified that they wanted to avoid any discussion which highlighted or explained that Zommer's erratic and eccentric behavior during trial was actually a suppressed version of the "true Zommer." The defense was concerned that the instruction would allow the jury to focus on, and potentially fear, Zommer's mental instability. Counsel were additionally concerned that the jury might fear how Zommer would react in a less restrictive prison environment. We conclude that this decision was made after careful contemplation and reflects a reasonable and strategic trial strategy.

the instruction might negatively impact the jury's view of Zommer. This decision was reasonable and strategic, and clearly falls within the wide range of acceptable professional conduct.

Moreover, counsels' purported failure to alert the jury that Zommer's "true demeanor" was suppressed by psychotropic medication is refuted by the record. The jury had more than ample time to observe his demeanor over the course of the nine-day trial. When Zommer testified, the jury heard him confess in intricate detail to the murder and explain his thought process during the murder as to why he attacked the victim. See Zommer, 31 So. 3d at 739-40. It is reasonable to conclude that after hearing Zommer's disturbing testimony and witnessing his erratic behavior during trial, an instruction informing the jury that Zommer's behavior was aided by psychotropic medication would not have benefitted the defense. Rather, the instruction likely would have had a significant negative impact on the jury's perception of Zommer's mental stability.

Moreover, even if counsel had requested the instruction, it is unlikely that the trial court would have provided it. This Court has previously held that the plain language of rule 3.215(c)(2) requires an instruction on psychotropic medication only when the defendant's ability to proceed to trial is dependent on the use of such medication. See Alston v. State, 723 So. 2d 148, 158 (Fla. 1998). Here, trial counsel testified during the evidentiary hearing that nothing in their

interactions with Zommer suggested that he did not have the ability to proceed to trial without drugs. Further, Zommer was evaluated by three mental health professionals who never questioned Zommer's ability to proceed to trial. As a result, Cashman testified that the defense did not have a good faith basis to believe that Zommer was incompetent to stand trial and, therefore, did not seek a competency evaluation. Zommer's competency was not in question and his ability to proceed to trial was not <u>dependent</u> on the use of psychotropic medications. The assertion now that psychotropic medication diminished his ability to manifest symptoms of mental illness does not satisfy the requirements of the rule or establish a legal basis for entitlement to the instruction. Thus, counsel were not deficient for failing to request a jury instruction that was not applicable given the plain language of the rule.

These facts further demonstrate why Zommer's reliance on <u>Rosales v. State</u>, 547 So. 2d 221, 223 (Fla. 3d DCA 1989), is misplaced. In <u>Rosales</u>, the district court addressed whether <u>the trial court erred</u> when it denied the defendant's motion to instruct the jury that he took psychotropic medication at the time of trial, and not whether <u>counsel performed ineffectively</u> when they failed to <u>request</u> the instruction. <u>Id.</u> Additionally, the defendant in <u>Rosales</u> spent seventeen years in and out of mental health facilities, and three of the hospitalizations occurred within one year of the crime with which the defendant was charged. <u>Id.</u> On at least two

occasions, the defendant in <u>Rosales</u> was adjudicated mentally ill and was involuntarily committed. <u>Id.</u> In addition, several doctors testified that the defendant: (1) suffered from paranoid schizophrenia; (2) did not know right from wrong at the time of the murder; and (3) was insane at the time of the murder. <u>Id.</u> Most importantly, a psychiatrist specifically testified that the defendant was competent to stand trial <u>solely because</u> of the psychotropic medication. <u>Id.</u> Here, while Zommer suffers from bipolar disorder, he does not contend, nor is there any evidence to support that his mental illness has impacted his competency, or that his ability to stand trial was dependent on his use of psychotropic medication. Thus, the facts and procedural posture here are materially distinguishable from <u>Rosales</u>.

Furthermore, even if we were to assume that trial counsel performed deficiently by failing to request a jury instruction regarding Zommer's use of psychotropic medication, which we do not, Zommer has failed to demonstrate prejudice during either the guilt or penalty phase. During the guilt phase, Zommer consistently admitted that he murdered the victim, and previously described in great detail how he selected his weapons, evaluated the layout of the victim's home, and then used multiple means to effectuate her death. <u>Zommer</u>, 31 So. 3d at 744. This evidence conclusively establishes Zommer's guilt and demonstrates that counsels' failure to request the jury instruction during the guilt phase of trial does not undermine confidence in his conviction.

With regard to the penalty phase, the jury recommended a sentence of death by a vote of ten to two. Id. at 750. The trial court found four statutory aggravating circumstances, three of which—CCP, HAC, and prior violent felony—are among the weightiest aggravating circumstances in Florida's statutory sentencing scheme. See id. at 751; see also Morton v. State, 995 So. 2d 233, 243 (Fla. 2008); Sireci v. Moore, 825 So. 2d 882, 887 (Fla. 2002). Although the trial court found ten nonstatutory mitigating circumstances, it afforded only two "moderate" weight. Zommer, 31 So. 3d at 744. The trial court specifically found that Zommer suffered from mental health disorders, but determined that the disorders did not rise to the level of a major mental illness, and afforded this mitigation "little" weight. Id. Based on the significant aggravation and the relatively minor mitigation (which included a finding regarding Zommer's mental illness), Zommer has failed to demonstrate that counsels' failure to request the explanatory jury instruction would have created a reasonable probability sufficient to undermine confidence in the outcome of his penalty phase trial. Based on the foregoing, we deny this claim.

### Failure to "Rehabilitate"

During the penalty phase, the defense presented multiple mental health experts. One expert, Dr. Danziger, testified on direct examination that Zommer suffered from bipolar disorder and substance abuse disorder. During cross-examination, the prosecution elicited from Dr. Danziger his opinion that Zommer

also suffered from antisocial personality disorder.  Defense counsel did not address the issue on redirect examination.  Zommer now contends that his trial counsel performed deficiently when they failed to "rehabilitate" Dr. Danziger after he testified that Zommer suffered from antisocial personality disorder.  Essentially, Zommer alleges that counsel performed deficiently when they did not <u>impeach</u> Dr. Danziger with evidence that antisocial personality disorder was an inappropriate diagnosis.  Notably, despite Zommer's contention that counsel performed deficiently when they failed to impeach Dr. Danziger's purportedly incorrect diagnosis of antisocial personality disorder, Zommer does not contend that counsel performed deficiently when they <u>presented</u> Dr. Danziger as a witness.[5]

To support this claim, Zommer notes that during the penalty phase, the defense presented Dr. Jethro Toomer, a clinical psychologist, who testified that Zommer did not suffer from antisocial personality disorder.  However, during

---

5. Zommer does, however, allege that Dr. Danziger incorrectly diagnosed him with antisocial personality disorder.  To support this claim, Zommer presented Dr. Maher, who testified during the evidentiary hearing that he disagreed with Dr. Danziger's diagnosis.  This disagreement, however, does not constitute a basis for postconviction relief.  Simply because Zommer has now secured an expert who disagrees with Dr. Danziger's diagnosis does not render counsels' initial decision to present Dr. Danziger unreasonable.  This claim is, therefore, without merit.  <u>See</u> <u>Floyd v. State</u>, 18 So. 3d 432, 454 (Fla. 2009) ("Trial counsel's investigation into mental-health mitigation 'is not rendered incompetent merely because the defendant has now secured the testimony of a more favorable mental health expert.' " (quoting <u>Asay v. State</u>, 769 So. 2d 974, 986 (Fla. 2000))).

cross-examination, the prosecution significantly impeached Dr. Toomer regarding this conclusion. On redirect examination, defense counsel rehabilitated Dr. Toomer by asking him questions regarding Zommer's relationships with his ex-wife and son. These questions provided Dr. Toomer with the opportunity to explain that individuals who suffer from antisocial personality disorder do not experience episodes of relative stability and appropriate functioning, or times where they care about the welfare of others. Rather, he explained that individuals with antisocial personality disorder "have a continuing history where they are exploiting other people. There are no breaks." Defense counsel also rehabilitated Dr. Toomer by asking him to highlight additional qualities which Zommer possessed that were inconsistent with a diagnosis for antisocial personality disorder.

During the evidentiary hearing, Sims testified that he and Cashman were aware that Dr. Danziger had diagnosed Zommer with antisocial personality disorder, but made a strategic decision to present Dr. Danziger as a witness because they believed that the positive attributes of his testimony outweighed the negative. Specifically, Sims noted that Dr. Danziger was the only psychiatrist— out of the five doctors that evaluated Zommer—who concluded that Zommer suffered from bipolar disorder. Further, Sims testified that the defense presented Dr. Danziger because he: (1) had a strong presence in front of the jury; (2) had a

strong educational and "hands-on" background; (3) frequently testified for the State; and (4) presented a "perfect storm" theory that Cashman and Sims believed meaningfully connected the mitigating circumstances and explained why Zommer may have committed the murder.[6] Sims testified that the defense did not elicit on direct examination Dr. Danziger's diagnosis of antisocial personality disorder because it was unfavorable testimony and was contrary to that of Dr. Toomer. When asked why he did not impeach Dr. Danziger after Dr. Danziger testified on cross-examination that Zommer met the criteria for a diagnosis of antisocial personality disorder, Sims responded:

---

6. During the penalty phase, Dr. Danziger was asked "how does Todd Zommer end up in that orange jumpsuit . . . ?" Dr. Danziger responded:

> Everything bad that could have happened did. You have someone who has a loaded family history for substance abuse. You have someone who may have suffered some oxygen deprivation at birth. He grew up in a family where he witnessed domestic violence. He was physically abused, according to the records. There's reports that he may have been sexually abused by other youths at one of the facilities that he was at. And he grew up in a home . . . with no love, emotional warmth, someone who was emotionally neglected. All of this was very fertile ground for the development of mental illness and substance abuse.
>
> We saw early in his life . . . stirrings of a mental disorder. . . . He had features of hyperactivity, impulsivity, aggression, uncontrolled conduct problems, all of these things together as he grew up and grew older. As he got into his adulthood, the mental illness showed itself in full form. Unfortunately, like many individuals with bipolar disorder, he resorted to drugs. . . . The combination of crystal meth, cocaine, bipolar disorder, all of these things together, combined with everything in his early life: a perfect, terrible storm.

While with Dr. Toomer I was able to go back and talk to him about [the diagnostic criteria for antisocial personality disorder], and he was able to explain—'cause he didn't have that diagnosis, he was able to explain why this [diagnosis] didn't work. To do the same thing with Dr. Danziger would just have him explain why that diagnosis was correct to me. He wasn't [going to] come off that diagnosis; some worse factual issues had a chance of coming out. And the bottom line was, I didn't want get in front of the jury and say, this is a great expert, he's perfect, he's told you exactly how this crime occurred and why [Zommer] should not get the ultimate penalty with regards to A, B and C, but as far as D goes, oh, don't listen to that, because . . . he doesn't know anything about [it]. That's not a consistent approach to a witness and I wasn't going to fight with my own witness over that.

Sims further explained:

I thought [Dr. Danziger's] opinion was valid, even though there are some . . . gaps . . . in whether or not [Zommer met all of the diagnostic criteria], based on his two and a half years self-reported doing fine and actually loving his wife and his children. And I thought that Dr. Danziger, when we talked to him about whether [Zommer] suffered from that mental illness, he made real good sense that he did. So I don't—I didn't want the doctor explaining that to the jury.

This testimony reflects that although the defense was aware Dr. Danziger had diagnosed Zommer with antisocial personality disorder, they believed the remaining portions of his testimony substantially benefitted their mitigation strategy and outweighed the negative impact associated with a diagnosis of antisocial personality disorder—particularly because he was the only psychiatrist that diagnosed Zommer with bipolar disorder.[7] Counsel believed that Dr.

---

7. Dr. Daniel Tressler, a psychologist presented by the State, concluded that Zommer did not suffer from bipolar disorder because he believed that Zommer

Danziger's strong credentials and prior experience as an expert who testified for both the defense and the State further bolstered the credibility of his testimony. Counsel also extensively discussed with Dr. Danziger why he believed Zommer was mired in a "perfect, terrible storm" of mental instability immediately before he murdered the victim.

When the prosecution elicited Dr. Danziger's diagnosis of antisocial personality disorder on cross-examination, counsel made a strategic decision not to dispute or impeach on redirect examination the testimony of their most important expert. Counsel believed that the antisocial personality disorder diagnosis was supported by the evidence, and did not question Dr. Danziger further regarding his diagnosis because they did not want to risk opening the door to the admission of even more unfavorable evidence that would have actually undercut the mitigation value of the testimony already presented. See Reed v. State, 875 So. 2d 415, 437 (Fla. 2004) ("An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword."). Thus, we conclude that counsel did not perform deficiently when they failed to impeach their most important expert regarding his diagnosis of antisocial personality disorder, a diagnosis that counsel believed was reasonably supported

_____

exhibited no signs of the disorder after drugs were removed from his system. Zommer, 31 So. 3d at 749.

by the evidence.  See Schoenwetter v. State, 46 So. 3d 535, 554 (Fla. 2010) (holding that "[r]easonable decisions regarding trial strategy, made after deliberation by a claimant's trial attorneys in which available alternatives have been considered and rejected, do not constitute deficient performance under Strickland.").

Zommer also cannot demonstrate prejudice for several reasons.  First, he has presented no evidence to demonstrate that the failure to impeach Dr. Danziger's diagnosis of antisocial personality disorder undermines confidence in his death sentence.  To the contrary, had trial counsel attempted to impeach Dr. Danziger by asserting that Zommer had previously exhibited behavior inconsistent with a diagnosis of antisocial personality disorder, Dr. Danziger likely would have testified, as he did during the evidentiary hearing, that it was not uncommon for antisocial individuals to sustain periods of relative stability, and would have concluded that Zommer suffered from antisocial personality disorder despite these periods of stability.  This testimony would have not only supported Dr. Danziger's unfavorable diagnosis, but would have undercut both the remaining portions of Dr. Danziger's testimony regarding the "perfect storm" theory and Dr. Toomer's testimony that the periods of stability in Zommer's life indicated he did not suffer

from antisocial personality disorder.[8]  Thus, had counsel attempted to impeach Dr. Danziger, they would have unsuccessfully challenged the clinical diagnosis of one of their best and strongest experts and undercut the arguably less credible testimony of another.  Zommer has in no way demonstrated that this counterintuitive strategy undermines confidence in his death sentence.

Furthermore, based on the established aggravation and the relative lack of mitigation, we conclude that Zommer has failed to demonstrate prejudice by any purported failure of counsel and affirm the denial of this claim.

## HABEAS CLAIMS

In his petition for a writ of habeas corpus, Zommer asserts that: (1) Florida's capital sentencing scheme is unconstitutional as applied; (2) Florida's capital sentencing scheme is unconstitutional because it is applied in an arbitrary and capricious manner, and trial and appellate counsel did not adequately raise this issue; (3) cumulative errors deprived him of a fair trial; and (4) he may be incompetent at the time of his execution.  The majority of these claims are not cognizable in a petition for habeas relief, and Zommer's properly raised claim of

8.  Dr. Toomer was the only doctor who concluded that Zommer suffers from borderline personality disorder (as opposed to antisocial personality disorder), despite concluding that Zommer: (1) possesses all seven criteria of antisocial personality disorder, and (2) was diagnosed with conduct disorder as a child (a prerequisite to a diagnosis of antisocial personality disorder).  Zommer, 31 So. 3d at 748-49.

- 29 -

ineffective assistance of appellate counsel is without merit. Zommer's claims are substantially similar to those presented and rejected in Smith v. State, 126 So. 3d 1038, 1053 (Fla. 2013). We reject these claims for similar reasons.

First, we have previously denied claims by Zommer on direct appeal that Florida's capital sentencing scheme is unconstitutional as applied. See Zommer, 31 So. 3d at 752-53. He is, therefore, procedurally barred from relitigating this claim a second time in a habeas petition. See Blackwood v. State, 946 So. 2d 960, 976-77 (Fla. 2006) (rejecting a Ring/Apprendi claim in Blackwood's habeas petition as procedurally barred because it was raised and rejected on direct appeal); see also Smith, 126 So. 3d at 1053 ("Habeas corpus should not be used as a vehicle for presenting issues which should have been raised at trial and on appeal or in postconviction proceedings." (quoting Wright v. State, 857 So. 2d 861, 874 (Fla. 2003))). Second, this claim is not properly presented in this habeas petition because Zommer presented basically an identical claim in his initial postconviction motion, which was rejected by the postconviction court. Smithers v. State, 18 So. 3d 460, 472 (Fla. 2009) ("[E]ach claim is procedurally barred because Smithers raised an identical claim in his motion for postconviction relief."). Accordingly, we deny this claim.

Zommer is also not entitled to relief on his claims that Florida's capital sentencing scheme is unconstitutionally arbitrary and capricious, and counsel

performed ineffectively when they failed to raise this issue on appeal. Zommer's challenges to Florida's death penalty scheme are procedurally barred because they were raised in his initial postconviction motion and rejected by the postconviction court. See id.

Further, Zommer's claims of ineffective assistance of counsel are without merit. This Court has consistently rejected the argument that Florida's death penalty scheme fails to prevent the arbitrary and capricious imposition of death sentences and constitutes cruel and unusual punishment. See, e.g., Lugo v. State, 845 So. 2d 74, 119 (Fla. 2003). Thus, because Zommer's challenges are meritless, appellate counsel did not perform ineffectively by failing to present this claim on direct appeal, and Zommer is not entitled to relief. See Smith, 126 So. 3d at 1054.

Zommer's cumulative error claim is also procedurally barred because the claim was presented in his initial postconviction motion and rejected by the postconviction court. See id. at 1053. The claim is barred for the additional reason that it attempts to relitigate claims of ineffective assistance of trial counsel. See Nelson v. State, 43 So. 3d 20, 34 (Fla. 2010) ("Nelson's claim that trial counsel was ineffective is denied because ineffective assistance of trial counsel is not cognizable in habeas corpus."). Further, even if the claim were not procedurally barred, each of Zommer's individual claims of ineffective assistance of trial counsel independently lack merit, and therefore there are no errors, let alone

- 31 -

cumulative error, to consider. Zommer is not entitled to relief on this claim. See

Patrick v. State, 104 So. 3d 1046, 1069 (Fla. 2012), cert. denied, 134 S. Ct. 85

(2013).

Finally, we deny Zommer's competency at execution claim because it is not

yet ripe for review. See Nelson, 43 So. 3d at 34 ("We also deny Nelson's

competency claims because they are not ripe for review and were raised solely for

preservation purposes." (citing State v. Coney, 845 So. 2d 120, 137 n.19 (Fla.

2003))).

## CONCLUSION

For the reasons discussed, we affirm the postconviction court's denial of

Zommer's motion for postconviction relief and deny his petition for a writ of

habeas corpus.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Two Cases:

An Appeal from the Circuit Court in and for Osceola County,
        Jon Berkley Morgan, Judge - Case No. 492005CF001200CRXXXX
And an Original Proceeding – Habeas Corpus

Bill Jennings, Capital Collateral Regional Counsel, Middle Region, Richard Edward Kiley, Assistant Capital Collateral Regional Counsel, Middle Region, and Ali Andrew Shakoor, Assistant Capital Collateral Regional Counsel, Middle Region, Tampa, Florida,

     for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Katherine Maria Diamandis, Assistant Attorney General, Tampa, Florida,

     for Appellee/Respondent